# EXHIBIT A

**STATE OF RHODE ISLAND AND PROVIDENCE PLANTATIONS**

**PROVIDENCE, S.C.** **SUPERIOR COURT**

JOSEPH GRILLO,
PLAINTIFF *Pro Se*

v.

ERIC LYNN ANDRIST,
DEFENDANT

CIVIL ACTION NO: PC-2020-05326

***AMENDED COMPLAINT***

**COMES NOW**, Joseph Grillo and hereby files this Complaint seeking damages and injunctive relief against Eric Lynn Andrist. **IN** support thereof, Plaintiff Grillo states as follows:

This is a civil action seeking compensatory and punitive damages and to permanently enjoin the Defendant, Eric Lynn Andrist, from cyberbullying, harassing, slandering, libeling, maligning or otherwise interfering with the Plaintiff, over the internet, or elsewhere. Further, permanent injunction is sought, ordering Defendant Andrist from using Plaintiff Grillo's name or identifying information on present or future internet websites that he sponsors or is anyway apart thereof.

Plaintiff Grillo seeks injunctive relief pursuant to Rule 65 of the Rhode Island Superior Court Rules of Civil Procedure. In addition, the Plaintiff seeks damages to the extent this Court permits, and appropriate expenses and fees.

**General Averments**

1. Plaintiff Joseph Grillo is a resident of Rhode Island and resides at 73 Primrose Hill Road, Barrington, Rhode Island 02806.

2. The Defendant is Eric Lynn Andrist, born July 1962, is a California resident who presently resides at 12155 Morrison Street, Valley Village, California, 91607.

3. The Defendant began and maintained an internet-published "Tumblr" social networking site. The URL for this site was https://baddoctordatabase.tumblr.com/. This site was in existence for greater than six years. It was a database collection of physicians and other healthcare

professionals who resided nationally, all of whom had various levels of difficulty and who had come under scrutiny by their respective disciplinary administrative agencies. Recently the host, Tumble.com, removed his database due to various violations including incitement and hate-speech violations.

4. Since then he has transferred the database and content to a different website, 4patientsafety.org, under the title heading, The Patient Safety League. This site does not use a third-party social networking platform (such as Tumblr). Instead it is an independent, grass-roots site, developed using Wordpress.org.

5. Defendant Andrist actively trolls individual state databases in search of physicians and others (nurses, physician assistants, etc.) targeting those who have come under disciplinary actions. Previously, he posted the names of these professionals under the heading "Bad Doctor Database."

6. The Defendant compiles and integrates into his website the names of people accused of sex offenses and other serious felonies along with people such as the Plaintiff – who has substance use disorder (alcoholism).

7. Previously, when his Tumblr account was in existence, Defendant Andrist compiled all names were under one heading – "bad doctors." The inference was a false one. Presently, The Patient Safety League continues along the same path. Courts have recognized this sort of speech as unprotected hate speech.

8. The Defendant's premise is that he is a "patient advocate" and performing a "public service." Nothing could be farther from the truth. Each and every person listed has already come under scrutiny in their home state. By virtue of state action and local reporting, each person is already known to the public. Next, each person's offense is memorialized in their respective Department of Health website. The public has already been properly served and continue to be. By this point, the person named has gone through significant personal crisis and is in psychic pain. Here, the intent is to re-package and falsely label information in a hateful manner. The absolute only person who benefits from this is Defendant Andrist - to appease his misguided and sinister intent. The misfortunes of the health care providers – many of whom have reformed and redeemed themselves and are seeking to reintegrate into society – are being used by Defendant Andrist as a marketing ploy. This provides Defendant Andrist with credibility on which he advances himself and his business as a "patient advocate."

9. To re-iterate, the Defendant's process consists of active trolling for physicians who have had any sort of legal or ethical issues. He assimilates these names and re-publishes the names and identifying information of each person. This was previously accomplished under the heading of his Tumblr website "Bad doctor database," and presently under 4patientsafety.org. The Defendant's intent is to harm the individual. There is no public benefit whatsoever.

10. In Rhode Island, the Defendant continues to actively troll the Rhode Island Department of Health and news outlets in the state in order to garner the names of each and every physician who has had licensure or legal issues.

11. The defendant incorporates Rhode Island health care providers into his website's database, and he often adds some level of commentary. His website includes names and identifying information of health care professionals nationally.

12. The Defendant includes some, but not all of the suspect healthcare providers. His process appears to be random and not with any sort of hierarchy as to the severity of the offense. Most of the named individuals from Rhode Island are of a protected class (addicts who are in remission) under the Americans With Disabilities Act (discussed *infra*).

13. Out of all the national entries in the Defendant's database, some are charged with very serious crimes such as sexual offenses, while the lions-share are facing issues of addiction. Notwithstanding, this inference leads a reasonable person to conclude that all who are listed are "bad doctors" who are likely to be felons – and who are charged or convicted of serious felonies, including child sexual offenses.

14. Defendant Andrist has purposely acted anonymously. Previously, his website was "authorless." He has been entirely unwilling to stand behind what he says. Due to certain loopholes he succeeded in remaining hidden for years. In fact, in the present case, it took years of effort to uncover his identity.

15. The vast majority of doctors who are listed on the Defendant's database are in fact not bad doctors. Like the Plaintiff, many have mitigated the inciting issues and have effectively moved forward in their professional and personal lives. In fact, most have regained their status as valued healthcare providers in Rhode Island (a state with a vast under-shortage of physicians). Yet all remain a "bad doctor" for perpetuity or, in the alternative, permanently inscribed in his present website endeavor. Here, there is no reprieve.

16. All news agencies offer a procedure for removing stories from their archives. They realized the value to being fair and even-handed. Plaintiff Grillo contacted over twenty news agencies; he went through their respective processes and was one-hundred-percent successful in having his name removed. Unlike the news agencies, here there is no mechanism offered by the Defendant for even-handedness – to remove names upon a showing that charges have been dismissed, sealed, expunged or that significant time has passed since the infraction. He does not acknowledge the difference between a person with an impairment from those who are actively impaired. In the end, a person with an impairment who is stable has his name intermixed with those charged and convicted of sex crimes.

17. Plaintiff Grillo has requested that the Defendant remove his name from the defendant's website. Indeed, many attempts were made by the Plaintiff, spanning over one year. Prior to filing this complaint, all efforts were made to find an amicable remedy. Defendant Andrist's response has always been to ridicule and taunt the Plaintiff – clearing deriving pleasure in doing so.

18. The instant suit would not have been filed if the Defendant removed Plaintiff's name from his associated websites. Removal of the Plaintiff's name would be simple. There are good reasons to do so and no reason to not do so.

19. The Defendant received notice of the harm that this information causes, particularly to be categorized as a "Bad Doctor." He has been on notice as to the devastating consequences of being named on this database.

20. Requests for even-handedness have been made on multiple occasions. In all instances, the Defendant has refused to do so – and in the process has taunted, insulted and ridiculed the Plaintiff. He absolutely refuses to remove names from his list of shame.

21. The Defendant has been made aware of not only the devastating professional effects, but also the horrific personal effects of his characterization of the Plaintiff. The Defendant refusal is in the setting of there being a long period of time since the inciting offense; an complete mitigation of the underlying cause. The Plaintiff's has completed law school. His subsequent search for employment has been derailed by the Defendant's website. The Defendant was told of the continued harassment of the Plaintiff's child by the child's peers on account of the defamatory comments. The Defendant refuses to make any remedial measures and has therefore acted, and continues to act, intentionally and maliciously. The Defendant is fully aware of how emotionally charged this issue is for the Plaintiff. In this setting, the Defendant continually ridiculed, taunted, and insulted the Plaintiff, seemingly basking in his position of control.

22. On May 11, 2020, the Plaintiff graduated law school with honors. The plaintiff has published legal research papers and has been awarded the Orr Award for outstanding research paper submission by the American College of Legal Medicine. The plaintiff was selected as Teaching Assistant for Criminal Procedure and Secured Transactions (merit-based selections). The Plaintiff started recovery meetings on campus and has mentored other law students who are dealing with addiction. The Plaintiff has developed and nurtured an outstanding reputation both within the law school community and in the public realm. In the setting of these and other accomplishments, the Plaintiff has been harmed emotionally and continues to be. The Plaintiff is harmed by the Defendant's website with respect to attaining employment in the legal profession. The consensus among potential employers has been that while individual attorneys are often personally accepting of Plaintiff Grillo, they are unwilling to subject their professional entities to the potential fallout that comes from negative internet publications.

23. The Plaintiff's actions have occurred within and outside the State of Rhode Island and have caused injury within and to the State of Rhode Island, and to the named residents (*infra*) of Rhode Island.

**Jurisdiction**

24. The Rhode Island Long-Arm Statute states, *in haec verba,* that "[e]very foreign corporation, every individual not a resident of this state ..., and every partnership or association..., that shall

have the necessary minimum contacts..., shall be subject to the jurisdiction" of the Rhode Island Courts. R.I. Gen. Laws § 9-5-33(a).

25. The Statute further provides (in relevant part):

> "Every foreign corporation, every individual not a resident of this state ... and every partnership or association, composed of any person or persons not such residents, that shall have the necessary minimum contacts with the state of Rhode Island, shall be subject to the jurisdiction of the state of Rhode Island ... in every case not contrary to the provisions of the constitution or laws of the United States."*Id.*

26. As interpreted by the Rhode Island Supreme Court, the long-arm statute permits the exercise of jurisdiction over nonresident defendants to the fullest extent allowed by the United States Constitution. *See, e.g., Rose v. Firstar Bank,* 819 A.2d 1247, 1250 (R.I. 2003). "To ensure constitutional due process to a nonresident defendant, certain minimum contacts with the forum state are required 'such that the maintenance of the suit does not offend "traditional notions of fair play and substantial justice."'" *Kalooski v. Albert-Frankenthal AG,* 770 A.2d 831, 832-33 (R.I. 2001) *(per curiam)* (quoting *Ben's Marine Sales v. Sleek Craft Boats,* 502 A.2d 808, 809 (R.I. 1985) and *International Shoe Co. v. Washington* , 326 U.S. 310, 316 (1945)).

27. The minimum contacts requirement protects defendants from the burden of having to litigate in an inconvenient forum and it ensures that states "do not reach out beyond [their] limits ... as coequal sovereigns in a federal system." *Cerberus Partners, L.P. v. Gadsby & Hannah, LLP,* 836 A.2d 1113, 1118 (R.I. 2003) (quoting *World-Wide Volkswagen Corp. v. Woodson,* 444 U.S. 286, 292 (1980)).

28. A determination of the minimum contacts that will satisfy the requirements of due process will depend upon the facts of each particular case. *Ben's Marine Sales,* 502 A.2d at 810. "The fundamental question [ ] is [ ] whether the defendant's conduct and connection with the forum State are such that he might reasonably anticipate being haled into court there." *Cerberus Partners,* 836 A.2d at 1118.

29. Furthermore, due process will be satisfied if "the defendant has 'purposely directed' his activities at residents of the forum...**and the litigation results from alleged injuries that 'arise out of or relate to' those activities."** (emphasis added) *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 472, 105 S.Ct. 2174, 2182, 85 L.Ed 2d 528 (1985). The alleged damages must have arisen out of or relate to the activities "purposely directed" at residents of the forum state. *Goetz v. LUVRAJ, LLC*, 986 A.2d 1012 (R.I. 2010)

30. With respect to internet cases, one of the seminal cases is *Bensusan Restaurant Corp. v. King*. Here, the Court held that when an Internet publisher does no more than post a "passive" Web site, there is no basis for long-arm jurisdiction. When a Web publisher targets the forum state, solicits commercial activity within that state, or engages in other contacts with the state *in addition* to the posting of the Web Site that favor the exercise of jurisdiction, assertions of long-arm jurisdiction will be upheld. *Bensusan Restaurant Corp. v. King*, 937 F. Supp. 295 (S.D.N.Y. 1996), aff'd, 126 F.3d 25 (2d Cir. 1997).

Case Number: PC-2020-05326
Filed in Providence/Bristol County Superior Court
Submitted: 8/1/2020 6:49 PM
Envelope: 2688915
Reviewer: Alexa G.

31. As the undisputed facts will show, the number and nature of the contacts between Defendant Andrist, a Web publisher, author and content editor, and Rhode Island gives rise to personal jurisdiction.

32. The Defendant has purposefully availed himself of the privilege of conducting his business in the State of Rhode Island on many occasions. For example, just a few of the more recent Rhode Island contacts include the following Rhode Island physicians:

    - Dr. Joseph Grillo
    - Dr. Fathalla M. Mashali;
    - Dr. Jerrold Rosenberg;
    - Dr. Eugene Ouellette;
    - Dr. Fatalla Marshali;
    - Dr. Henry Cabrera;
    - Dr. William Lee Thompson.
    - Dr. Grace Harlow

33. Moreover, Defendant Andrist has also targeted Rhode Island physician assistants, nurse practitioners, and dentists. Defendant Andrist actively trolls the Rhode Island Department of Health (RIDOH) website, media outlets and other sources. He continuously searches for an publishes the names of healthcare professionals who have fallen in disfavor in the State of Rhode Island. He then publishes these names and identifying information on his website 4patientsafety.org. The name of this site is "The Patient Safety League." Most often, he republishes the information from the RIDOH and local news outlets (i.e. The Providence Journal), and then adds his own editorial. Frequently what he publishes is false. To make matters worse, Defendant Andrist uniformly and absolutely refuses any and all requests to remove names from his website, even when his victims have been completely vindicated. He has repeatedly refused to remove Plaintiff Grillo's name and information.

34. In addition, the defendant presently continues to reach out to Rhode Island by actively and continuously performing digital surveillance of health care providers within the State of Rhode Island. The Defendant's intent is to continue to do the same in the future. The Defendant, therefore, presently has and continues to pursue sufficient contacts within the State of Rhode Island.

35. In summary, in *International Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945) and its progeny, a three-part test determines specific personal jurisdiction: (1) does "the defendant purposefully avail[] itself of the forum state"; (2) does the cause of action arise out of the defendant's activities in the forum; and (3) is the exercise of jurisdiction fundamentally fair? Here, the Defendant proactively and continuously seeks out Rhode Island health care providers. For each provider, he publishes and then editorializes. He has conducted these activities for greater than six years. He continues to do so now and will do so in the future. Undoubtedly having the Defendant defend in the State of Rhode Island is fundamentally fair.

36. The facts and circumstances are substantially more than sufficient for Rhode Island to have personal jurisdiction over Defendant Andrist.

37. Here, the Defendant, a Web publisher, editor and author – has in the past and continues today to target our forum Rhode Island; he engages in contacts within the state *in addition* to the posting of the Web Site, thus satisfying *Bensusan.*

38. Overall, the result is that an individual, of his own devises and with harmful intent, is capable of attacking thousands, including an important segment of Rhode Island's professional population. His actions have been and continue to be extraordinarily harmful to the Plaintiff and other Rhode Islanders. Andrist's actions are not only actionable but defy any sense of decency and fairness. For this reason, having him defend in the State of Rhode Island is fundamentally fair.

**Count I – Intentional Infliction of Emotional Distress**

39. Plaintiff incorporates by reference the allegations contained in the above paragraphs 1 through 33.

40. Rhode Island recognizes a cause of action for the intentional infliction of emotional distress, and in doing so, we adopted the standard set forth in § 46 of the Restatement (Second) *Torts. See Champlin v. Washington Trust Co. of Westerly,* 478 A.2d 985, 988–89 (R.I.1984). To impose liability upon defendant based upon this cause of action, "(1) the conduct must be intentional or in reckless disregard of the probability of causing emotional distress, (2) the conduct must be extreme and outrageous, (3) there must be a causal connection between the wrongful conduct and the emotional distress, and (4) the emotional distress in question must be severe." *Id.* at 989.

41. Courts have interpreted the intent or recklessness element of the tort as referring to whether defendant intended to act towards plaintiff in a manner that can be considered outrageous; if so, then defendant may be held liable "if he knew or should have known that emotional distress was the likely result of his conduct." *Agis v. Howard Johnson Co.*, 371 Mass. 140, 144-45, 355 N.E.2d 315, 318 (1976); Samms v. Eccles, 11 Utah 2d 289, 293, 358 P.2d 344, 347 (1961); Womack v. Eldridge, 215 Va. 338, 342, 210 S.E.2d 145, 148 (1974) (noting that the requirement that wrongdoer's conduct be intentional or reckless "is satisfied where the wrongdoer had the specific purpose of inflicting emotional distress or where he intended his specific conduct and knew or should have known that emotional distress would likely result").

42. This view distinguishes between intention regarding the conduct and its likely victim, and intention regarding the consequences of the conduct. Plaintiff must show that the defendant intended to engage in conduct that is outrageous and that he or she intended or knew (or, perhaps, deliberately disregarded a high degree of probability) that the behavior would affect the plaintiff; once plaintiff has shown this, a reasonableness standard will be applied with respect to the issue of whether the defendant should have known that the conduct would cause

emotional distress to the plaintiff. *See Champlin v. Washington Trust Co. of Westerly,* 478 A.2d 985, 988–89 (R.I.1984).

43. In addition, Rhode Island has required at least some proof of medically established physical symptomatology for both intentional and negligent infliction of mental distress. *See Vallinoto v. DiSandro,* 688 A.2d 830, 838–40 (R.I.1997); *Swerdlick v. Koch*, 721 A.2d 849, 862–63 (R.I. 1998)

44. The Restatement identifies two considerations that may bear on whether in a given case the defendant's conduct reached the level of actionability: (1) the defendant's occupying a position of authority or power over the plaintiff; *See* Restatement of Torts 2d § 46, comment e: and (2) the defendant's awareness of some particular susceptibility of the plaintiff making him or her more vulnerable to suffer severe distress. *See* Restatement of Torts 2d § 46, comment f:

45. Here, first and foremost, the re-publication and subsequent commentary by Defendant Andrist serves no useful purpose whatsoever. The only time that names such as Plaintiff Grillo's is queried is when potential employers who are in the midst of making their employment decision performs the search. Otherwise, the public function has already been served contemporaneous to the time of the event. The only one served is Defendant Andrist – based on his private, nefarious motives. There is no good reason to deny Plaintiff Grillo's request to remove his name for the Defendant's website.

46. It is difficult to imagine the extent of emotional distress the Defendant, who resides in California, could inflict on the Plaintiff, who resides in Rhode Island.

47. In the course of discussions with the Defendant, and while the Plaintiff sought a remedy to the situation, Defendant Andrist has made countless cruel threats, and has taken certain actions – all of which were intended to inflict maximum emotional distress.

48. In considering the outrageousness of these threats, the overarching consideration relates to the relative differential in powers between the Plaintiff and Defendant as it applies to this specific instance – one which greatly favors the Defendant. The Defendant acts with impunity. Outside of criminal statutes, there are no limits to his malicious behavior. He is free act recklessly and to submit frivolous actions with the Rhode Island Board of Medical Licensure and Discipline (BMD).

49. On the other hand, the Plaintiff is highly vulnerable to precisely this sort of malicious attacks. Given his past substance use disorder and prior dealings with the BMD, any action that is reported will be scrutinized to the highest degree. Complaints will not be resolved for a matter of years. They will be very expensive to defend, and they inflict enormous emotional distress. The Defendant is fully aware of these issues. He has spent many years suing others on many occasions and interfering with the California Medical Board. He is knowledgeable in what to say, and has never been a champion of truth and accuracy. In fact, the only reason to file such a report is to inflict as much emotional harm as is possible.

50. Defendant Andrist is fully aware of the implications of reporting the Plaintiff to the BMD for any offense whatsoever – whether the offense is fabricated or not. In fact, Defendant Andrist's complaint to the BMD is entirely fabricated and outrageous of its own accord. The Defendant is fully aware that any incident whatsoever that gets reported will be investigated and will require counsel for defense. The process will last for years and be expensive to defend. No matter the merit of the complaint, it is highly emotionally distressful. The outcome can be variable. It has the potential to result in sanctions, fines, suspension or revocation of one's medical license.

51. Defendant Andrist is a person limited education and works by performing a mobile notary public service. He is accountable to no one. In addition, he is well versed in licensure medical boards, as he has been is a continuous dispute with the California Medical Board for years. Outside of work, he spends his time harassing the California Medical Board, filing complaints and expanding his database of "bad doctors."

52. Plaintiff Grillo is a licensed, Board Certified physician. He is subject to oversight by the Rhode Island Board of Licensure and Discipline (BMD). In this case, it is relevant that the Plaintiff has successfully mitigated his substance use disorder and now has many years of continuous, documented sobriety. The Plaintiff now hold a Juris Doctor degree. His professional affiliations are guarded treasures.

53. Defendant Andrist has repeatedly threatened the Plaintiff with reporting the Plaintiff. Defendant Andrist has gone beyond months of threats and actually submitted a fabricated complain to the BMD. He did so in order to inflict maximum emotional distress. Here, the Defendant's action was targeted, specific, malicious and retributive. It was cruel and has inflicted emotional distress. D knew of P's specific vulnerabilities and exploited them.

54. Defendant Andrist also is aware that negative media coverage could be devastating to any physician. The Defendant contacted the Providence Journal (July, 2020) in an attempt to harm Plaintiff Grillo. The Defendant did so with the same intent as he when filing a complaint to the BMD - to inflict maximum emotional harm to Plaintiff Grillo with the goal of denying Plaintiff Grillo his hard-earned livelihood.

55. Other attempts at inflicting emotional harm include the threat of reporting Plaintiff Grillo to the FBI and the DEA. Once again, his intent remains to cause maximum emotional harm by any means at his avail.

56. The Plaintiff has spent many years in counseling pursuing and maintaining his mental health. For the most part he has succeeded in rebuilding his professional credibility and gaining entry back into his profession. All of this has been hard-fought. Even before this, the Plaintiff spent over 14 years in training to become a physician. Next, the Plaintiff spent three years to gain entry into the legal profession. The Defendant is fully aware of this. The Defendant was fully aware of the Plaintiff's pending application to be re-licensed. The Defendant has done all at his command to subvert these efforts. The Defendant tantalized the Plaintiff on multiple occasions with this potential threat. Of note is that the BMD has made the determination that the Plaintiff be re-licensed. The Plaintiff is in fact a fully licensed and practicing physician. The Defendant believes that he should make such a determination.

57. Just a few of the many exemplary quotes from the Defendant:

*"You're a danger and a menace to society. You need psychological intervention. The Rhode Island Medical Board has finally confirmed that you're trying to get your medical license back. That's a problem. You know, though, that I need to let the Board know that you shouldn't be licensed, right?"*

Months later, the Defendant's threats became reality. He writes;

*"I've filed the medical board complaint and explained in detail about your crimes of intimidation, hacking, extortion, not to mention the homophobic hate crime information. I'm contacting a reporter at the Providence Journal as we speak."*

Source: Emails from Andrist

58. All of these statements are emotionally devastating. His accusations are bizarre and untrue. Once again, the Defendant's acts were targeted, specific to the Plaintiff's vulnerabilities, and intended to inflict maximum emotional harm. Had this not been so, there would be no need to write these. He would have simply filed a complaint or contacted the local news media. At the heart of all of these was the Plaintiff's initial request to remove Plaintiff's name from the Defendant's web site. Underlying this, there remains no rational basis for not removing the Plaintiff's name.

59. In fact, the Defendant directly caused the Plaintiff significant psychological distress and has been under the care of a psychiatrist and on medication as a direct and proximate result of the Defendant's cruel actions.

60. The Plaintiff has also suffered physical consequences due to the emotional distress and is under the care of a physician and on medication for these causative conditions.

**Count II – Intentional Interference With Prospective Advantage**

61. Plaintiff incorporates by reference the allegations contained in the above paragraphs 1 through 33.

62. The tort variously called interference with business relations, interference with economic opportunities, interference with prospective advantage or the like is an economic tort accomplished without physical harm to person or property. The tort is generally recognized in the Rhode Island courts. *Avilla v. Newport Grand Jai Alai LLC*, 935 A.2d 91, 98 (R.I.2007). The latter claim redresses interferences with mere economic opportunities that are not represented by existing, enforceable contracts. *Id.* On analogy to interference with contract, courts may also require the plaintiff to prove that the interfering defendant was a stranger to the economic opportunity involved. *Id.*

63. In Rhode Island, to recover on a claim of intentional interference with prospective advantage, a plaintiff must show: (1) the existence of a business relationship or expectancy; (2) knowledge

by the interferer of the relationship or expectancy; (3) an intentional and improper act of interference; (4) proof that the interference caused the harm sustained; and (5) damages to the plaintiff. *Beauregard v. Gouin*, 66 A.3d 489 (R.I. 2013)

64. As to the requirement that the interference must be intentional, Rhode Island has not required that actual malice be shown; rather, "legal malice—an intent to do harm without justification—will suffice." *Id.* (*quoting Jolicoeur Furniture Co. v. Baldelli*, 653 A.2d 740, 753 (R.I.1995)).

65. Defendant Andrist previously by published defamatory and injurious falsehoods on his Tumblr.com database, until it was removed for violating Tumblr's policy against hate-speech. Since then, Andrist has published on other social media platforms, including his own grass-roots website, 4patientsafety.org.

66. Here, Plaintiff Grillo notified the Defendant of how devastating and harmful the Defendant's portrayal of the Plaintiff was and continues to be. The Defendant was placed on notice on many occasions. The Plaintiff tried and failed in requesting that his name and profile be removed. The Defendant not only refused, but derived pleasure in mocking the Plaintiff.

67. The Plaintiff tried over an extended period to avoid litigation, to no avail.

68. In a setting where there is no absolutely no legitimate purpose for the publications except to harm the Plaintiff's status as a professional physician and attorney. This included the Plaintiff being disqualified from job opportunities that he is otherwise imminently qualified for.

69. The Plaintiff has submitted thousands of job applications. He has been uniformly rejected by all potential employers. Many potential employers who rejected the Plaintiff's application pointed directly at Defendant Andrist's website as the reason. This is in the setting of Plaintiff Grillo being highly qualified. He is a distinguished internal medicine/infectious disease physician. He has over 20 years of experience. He is well-published in the medical literature. Plaintiff Grillo was an honors law student with an impeccable reputation. He published three law review articles while a law student. He excelled at all endeavors. He started recovery meetings on campus and mentored multiple students with substance use disorder.

70. As a direct result of Defendant Andrist's publications – both past and present, Plaintiff Grillo has been harmed economically.

**Count III - Invasion of Privacy Based on False Light**

56. Plaintiff incorporates by reference the allegations contained in the above paragraphs 1 through 24

57. In Rhode Island, to recover under this section, plaintiffs must establish that "[t]here has been some publication of a fact which implies an association which does not exist; [and][t]he

association which has been published or implied would be objectionable to the ordinary reasonable man under the circumstances ." *Swerdlick v. Koch*, 721 A.2d 849, 861 (R.I. 1998)

58. Rhode Island recognizes the "right to be secure from publicity that reasonably places another in a false light before the public."
Rhode Island General Laws § 9-1-28.1(a)(4).

59. The Defendant publication of the Plaintiff has been found by virtually all potential employers as being objectionable.

60. The Defendant's publication implies an association that is false.

61. This has caused the Plaintiff to suffer economic and emotional harm.

**Count IV – Defamation**

62. Plaintiff incorporates by reference the allegations contained in the above paragraphs 1 through 24.

63. The Defendant published on his website utterances that were false in that they constituted ambiguous communication that were indirectly defamatory and have a defamatory meaning.

64. Indirect defamation blurs the line between truth and falsehood.

65. When considering whether a statement or conduct is defamatory, the court must take into account the context of the statement in which the publication occurs and the plain and ordinary meaning of the words in the community in which the publication occurred. *See* Epstein, *Cases and Materials on Torts* ch 16 at 1100.

66. It is a question for the fact trier—the jury (or the court sitting as a fact finder in a bench trial)—whether an ambiguous communication, statement, or utterance did have a defamatory meaning and whether a person of average intelligence would so comprehend it as such. *Id.* at 1104. See *Lundell Mfg., Inc. v. ABC, Inc.*, 98 F.3d 351, 360 (8th Cir. 1996), ("When the language and its context are ambiguous, it is for the jury to decide the meaning conveyed.")

67. If the defendant juxtaposes a series of facts so as to imply a defamatory connection between them or otherwise creates a defamatory implication, he or she may be held responsible for the defamatory implication even if certain of the facts are correct. *Id.*

68. The Defendant made multiple defamatory statements concerning the Plaintiff.

69. The Defendant made these statements with reckless disregard as to their falsity.

70. The Defendant caused the Plaintiff significant reputational, emotional and pecuniary harms. This has included multiple overt rejections in the fields of medicine and law.

71. In fact, the Defendant is a recovering alcoholic (alcoholism is a bona fide medical infliction) who has maintained eight years of documented continuous sobriety, is a board-certified physician, and has served his community with distinction for 15 years. He is a dedicated father to a fourteen-year old son and his wife of 20 years.

72. The general harm caused by the Defendant's defamation has included being ridiculed, shamed, hated, scorned, belittled or held in contempt by others, has lowered him in esteem of a reasonable person.

**Count V- Violation of Title III of The Americans With Disabilities Act**

73. In 1990, the Congress enacted the ADA "to establish a clear and comprehensive Federal prohibition of discrimination on the basis of disability in the areas of employment in the private sector, public accommodations, public services, transportation, and telecommunications." H.R. Rep. No. 101-485, at 28 (1990), *reprinted in* 1990 U.S.C.C.A.N. 303, 310.

74. It was implemented in order to provide a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities and to provide clear, strong, consistent, enforceable standards addressing that discrimination and to help individuals with disabilities to integrate into the economic and social mainstream of American life. 42 U.S.C.A. § 12101(b). Its language is construed broadly to advance its remedial purpose. This broad construction is based on the text of the statute and its legislative history. Its purpose is sweeping and its mandate comprehensive. *Hernandez v. County of Monterey*, 70 F. Supp. 3d 963 (N.D. Cal. 2014). The Act covers discrimination in employment, public services, and public accommodations. 42 U.S.C.A. §§ 12131 to 12165.

75. In enacting the ADA, Congress recognized that physical and mental disabilities in no way diminish a person's right to fully participate in all aspects of society, but that people with physical or mental disabilities are frequently precluded from doing so because of prejudice, antiquated attitudes, or the failure to remove societal and institutional barriers. 163 A.L.R. Fed. 339 (Originally published in 2000)

76. Section 2(a) of the Americans with Disabilities Act of 1990 (42 U.S.C. 12101) reads as follows:

> "(1) physical or mental disabilities in no way diminish a person's right to fully participate in all aspects of society, yet many people with physical or mental disabilities have been precluded from doing so because of discrimination; others who have a record of a disability or are regarded as having a disability also have been subjected to discrimination."

77. Plaintiff Grillo qualifies under the Americans With Disabilities Act (ADA) as having a disability. Here, addiction that is in remission is the disability as defined by the ADA. As such, Plaintiff Grillo is afforded the protections and rights under the ADA.

78. Defendant Andrist publishes a website and business (a 501c3 tax exempt corporation) whose stated mission is to "… *educate the public about medical errors and harm and how to remain safe as a patient*." Andrist's business is a Title III entity as defined by caselaw and the Department of Justice. 163 A.L.R. Fed. 339 (Originally published in 2000). Here, the Defendant is a Title III entity because his business is a "private entity which … operates a place of public accommodation." *See Lessmann v. City of Dearborn*, 16 A.D.D. 1165 (E.D. Mich. 1996); *Thomas By and Through Thomas v. Davidson Academy*, 846 F. Supp. 611 (M.D. Tenn. 1994).

79. Courts have defined the term "operate" within its contemporary, common meaning such that operation of a facility relates to its direct management. *Simenson v. Hoffman*, 12 A.D.D. 617 (N.D. Ill. 1995).

80. Therefore, in order for a plaintiff to show that a defendant is an operator of a place of public accommodation, the plaintiff must show the defendant (1) in a position of authority or control over the place providing services; (2) with both the power and the discretion to perform potentially discriminatory acts within the ambit of this authority; and (3) exercises his or her own discretion, as opposed to the implementation of institutional policy or the mandates of superiors, when performing potentially discriminatory acts. *Howe v. Hull*, 873 F. Supp. 72, 7 A.D.D. 960 (N.D. Ohio 1994).

81. Defendant Andrist controls all aspects of his website and business. He is the only person of authority; he possesses complete power and discretion to act in a discriminatory manner; and does so at his own discretion.

82. Title III of the ADA prohibits discrimination by a public accommodation on the basis of disability. 42 U.S.C.A. § 12182(a) reads as follows:

> No individual shall be discriminated against on the basis of disability in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation by any person who owns, leases (or lease to); or operates a place of public accommodation.

83. Defendant Andrist fulfills his company's objectives in part by using Plaintiff Grillo's disability as a means of marketing. He exploits physicians such as the Plaintiff as being dangerous and bad doctors. This serves as a marketing vehicle and provides the Defendant with the necessary credibility to fulfill his mandate.

84. Defendant Andrist's acts are overt and intentional. This is unusual in the scope of ADA discriminatory violations. Almost never are businesses and individuals found to inflict such direct, overt and purposeful harms solely for their personal gains – in this case, to market his business. His acts defy any semblance of decency and equity.

85. Defendant Andrist has *per se* violated the ADA by discriminating against Plaintiff Grillo. His actions have caused Plaintiff Grillo economic harm by precluding his attempts to become employed in his field(s).

86. Here, Defendant Andrist's violations preclude the Plaintiff's right to fully participate in all aspects of society – to be an active, contributing physician-attorney by impairing his ability to secure employment.

## Prayer for Relief

### Preliminary Injunctive Relief

87. Injunctive relief is one of the remedies allowed for upon a finding of violation of the ADA. 42 U.S.C.A. § 12188(a)(2)(b)(2)(A). Here, the relief sought is to order the Defendant to remove Plaintiff Grillo's name from all of the Defendants present and future websites and social media platforms.

88. The court also has the discretion to allow a reasonable attorney's fee, litigation expenses and costs to the prevailing party in an action under Title III of the ADA. 42 U.S.C.A. § 12205.

89. The relief sought is to enjoin Defendant Andrist from using Plaintiff Grillo's name and identifying information on 4patientsafety.org web site, and all other social media platforms that the Defendant is associated with. To order the immediate removal of Plaintiff Grillo's name and identifying information from all websites that Defendant Andrist is associated with.

90. In deciding whether to issue preliminary injunction, hearing justice should determine whether moving party: (1) has reasonable likelihood of success on merits; (2) will suffer irreparable harm without requested injunctive relief; (3) has balance of equities, including possible hardships to each party and to public interest, tip in its favor; and (4) has shown that issuance of preliminary injunction will preserve status quo. *DiDonato v. Kennedy*, 822 A.2d 179 (R.I. 2003).

91. In determining reasonable likelihood of success on merits, Supreme Court does not require party moving for injunctive relief to establish certainty of success, but rather, that party make out a prima facie case. *Id.*

92. 4PatientSafety.org is not an advocacy group. It is not a grass roots organization. It is an organization that posts harmful depictions of physicians and other health care providers intermixed with some who have been accused or convicted of serious crimes. It is self-serving. There is no value whatsoever in publishing Plaintiff Grillo's name and information. As mentioned, the only people to read the content are those considering Plaintiff Grillo for employment.

93. First it is certainly likely that Plaintiff Grillo will prevail on one, but more likely greater than one cause of action. The intentional interference claim, in particular is most likely to be successful.

94. Second, irreparable harm will occur since it is continuous. There is a finite employment pool, and each time that Plaintiff Grillo is denied based on Defendant Andrist's harmful publications – he loses more and more of the finite opportunities that exist.

95. In balancing the equities between the parties, this Court has stated that the relief which is sought must be weighed against the harm which would be visited upon the other party if an injunction were to be granted.

96. Here there is enormous and immediate benefit to Plaintiff Grillo, as he would be free to apply for employment in the free market based on the merits of his application. The harm to the Defendant is nil. He loses nothing.

97. Public interest here seems crystal clear. The State of Rhode Island has a shortage of physicians. The State of Rhode Island is served by preserving each and every physician's integrity when deserved.

98. Finally, the issuance of a preliminary order will stop the bleeding. It will allow Plaintiff Grillo to maintain the status quo of applying for employment while at the same time preparing for the Bar exam in Rhode Island.

99. Plaintiff Grillo respectfully requests that this Court affirm his request.

**Damage Award**

100. The awarding of damages in a civil case is to afford the Plaintiff the equivalent in money for the loss incurred by the wrongful conduct of the Defendant.

101. The Plaintiff respectfully requests the Court to consider the earnings lost to the Plaintiff.

102. The Plaintiff respectfully requests an award by the Court of punitive damages; that this Defendant acted with the intent of harming the Plaintiff.

103. Whereas Plaintiff Grillo prays for a judgment against Defendant Andrist as follows:

104. Awarding Plaintiff Grillo all damages he has coming as a result of Defendant Andrist's wrongdoings in the amount of $200,000. as the Court determines appropriate.

105. Awarding Plaintiff Grillo all reasonable costs, expenses and fees.

Case Number: PC-2020-05326
Filed in Providence/Bristol County Superior Court
Submitted: 8/1/2020 6:49 PM
Envelope: 2688915
Reviewer: Alexa G.

106. Granting permanent injunctive relief requiring Defendant Andrist to remove Plaintiff Grillo's name and any identifying information from any website to which Defendant Andrist is now or will be associated with.

107. Such further relief this court deems just and proper

The Plaintiff respectfully requests a bench trial.

DATE: August 3, 2020

Respectfully Submitted:
Joseph Grillo, M.D., J.D. (2020)
*Pro Se*
73 Primrose Hill Road
Barrington, Rhode Island 02806
Jfgrillo1@gmail.com
(401) 406-0012

Personally signed by me
Joseph Grillo