UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

| | |
|---|---|
| JOSEPH GRILLO, *pro se* : | |
| : | |
| Plaintiff, : | |
| : | |
| v. : | C.A. No. 2020-CV-0417-JJM-PAS |
| : | (R.I. Superior Court C.A. PC-2020-5326) |
| ERIC LYNN ANDRIST, : | |
| : | |
| Defendant : | |

MEMORANDUM IN SUPPORT OF DEFENDANT'S MOTION
TO STAY DISCOVERY, DISMISS AND FOR DAMAGES AND ATTORNEY'S FEES

Defendant Eric Lynn Andrist submits this Memorandum in support of his Motion to stay discovery, dismiss the Complaint and award damages and attorney's fees. As argued in further detail below, Plaintiff is entitled to this relief under the Rhode Island anti-SLAPP statute, R.I.G.L. §9-33-2, because the Complaint seeks to suppress Defendant's right to free speech on a matter of public concern.

1. Background

    A. Development of the Bad Doctor Database

Plaintiff is a medical doctor in Barrington, Complaint, ¶¶1, 52. Plaintiff is a resident of greater Los Angeles. Affidavit of Eric Lynn Andrist, ¶3. He had a family history of loved ones who died from causes he believed were the result of medical errors. Affidavit, ¶¶4-5. His experience motivated him in 2013 to join a public advocacy campaign to support a ballot initiative (California Proposition 46) to reform the state's medical malpractice law. Affidavit, ¶6. For his efforts, the campaign's organization named him the recipient of the 2013 Public Advocate of the Year Award. *See* Affidavit, ¶7 *and* Exhibit A. California's voters defeated the ballot initiative in 2014. *Id.*, ¶8.

In the meantime, Defendant began a new career as an advocate for patient rights. Affidavit, ¶9. In 2014, he started an internet weblog ("blog") that collected published news reports of doctors who engaged in questionable conduct. *Id.*, ¶10. He named his blog "The Bad Doctor Database." *Id.* From the beginning, the posts consisted of links to published online news reports about particular doctors, along with, in some cases, relevant documents concerning the doctor from medical licensing boards. *Id.*

He posted the Bad Doctor Database blog on a series of different platforms. Affidavit, ¶11. At the current time, it does not exist on any platform in its original form, although material from the blog does appear on the website of the Patient Safety League, an organization Defendant helped establish. *Id.*

Defendant worked with other advocates to form a nonprofit organization called "The Patient Safety League." Affidavit, ¶12. That organization formally registered as a charitable organization with the State of California and the Internal Revenue Service in 2018. *Id.* That year, it began its own website with the address www.4patientsafety.org. The Patient Safety League website contains information concerning patient rights and physician misconduct, including a separate database of doctor disciplinary information. *Id.*

B.      Listing for Plaintiff

In November, 2014, Defendant learned from a local news report about a 2011 incident involving Plaintiff, in which he crashed his car into a liquor store. Affidavit, ¶13. Defendant posted links to television video reports and online printed reports about the incident. *Id.* Defendant also posted links to two decisions by the Rhode Island Medical Licensing Board concerning Plaintiff, namely his license suspension in February, 2011 (as a result of the liquor store incident) and the reinstatement of his license in January, 2014. *Id. See* Affidavit Exhibit B

2

(screen shot of database from March 25, 2015), Exhibit C (copy of Board of 2011 Medical Licensure decision concerning Plaintiff that was linked on the blog), Exhibit D (copy of 2014 Board of Medical Licensure decision concerning Plaintiff also linked on the blog). At the time Defendant posted the information about Plaintiff in November, 2014, the database had entries for a total of 837 physicians. *See* Exhibit B.

In the years that followed, Defendant supplemented the post concerning Plaintiff with additional links to publicly available material concerning Plaintiff posted on the Board of Medical Licensure website. Affidavit, ¶15. *See also* Affidavit, Exhibits E (screen shot of the blog's post on Plaintiff as it appeared on December 18, 2018), F and G (material from two Board of Medical Licensure decisions from 2015 relating to Plaintiff that were linked to the blog as in Exhibit E screen shot). At the time of the December, 2018 post, the database had entries for 1,600 physicians. *See* Exhibit E.

In 2018, Defendant uploaded material from the Bad Doctor Database onto the Patient Safety League website. Affidavit, ¶16. One item Defendant uploaded at that time was his previous post about Plaintiff, which he had updated to include further action by the Board of Medical Licensure. That post remains live on the Patient Safety League website, and can be viewed at http://4patientsafety.org/2014/11/14/dr-joseph-f-grillo/. *See* Affidavit, ¶16 *and* Exhibit H thereto. The original Bad Doctor Database blog is no longer "live" online. *Id.*

The listings of Plaintiff in both locations have been limited to (1) links to and/or copies of published online news reports, (2) links to video of news reports and (3) links to published decisions of the Rhode Island Board of Medical Licensure. Affidavit, ¶17.

3

C.   Contacts with Plaintiff

Plaintiff first contacted Defendant on February 2, 2020. Affidavit, ¶18. At that time, his license to practice medicine was suspended. *Id.* In an email, Plaintiff asked Defendant to remove the post concerning him. *Id.* After much correspondence back and forth, Defendant agreed to remove the post concerning him for four months, provided that he did not re-apply to practice medicine. *Id.*

As part of his efforts to persuade Defendant to remove his name permanently from the website, Plaintiff sent Defendant a link to a retaliatory website Plaintiff had commissioned and published. Affidavit, ¶19; Exhibits I, J (reproduction of screen shots of Plaintiff's website). Plaintiff's website amounted to a combination of a declaration of war against Defendant, a recruitment poster for doctors to sue Defendant and a battle plan, including the following:

- Plaintiff has investigated a lawsuit against Defendant for two years. He will begin with lawsuits in Rhode Island and California, and recruit other doctors named on the website to be plaintiffs for a class action suit against Defendant in California (Exhibit J, pp. 1-2);

- Plaintiff plans to sue Defendant in as many states as possible to force him to defend in each venue and placing Defendant at risk of being defaulted if he does not defend (Exhibit J, p. 2);

- A judgment against Defendant can result in a lien on his property, which will compel him to remove the website permanently (Exhibit J, p. 2);[1]

- Defendant "will have to answer to a judge – and his delusional narcissism will work against him." (Exhibit J, p. 3);

---

[1]   For the record, the database currently appears on a website maintained by the Patient Safety League, which is not a party to this case. Because the Patient Safety League has not had any direct Rhode Island contacts, this Court probably lacks jurisdiction over it. *See Narcisi v. Turtleboy Digital Marketing LLC*, C.A. 2019-CV-0329 (Memorandum and Order, September 3, 2020).

4

- Plaintiff will prepare all the legal work necessary for anyone who wants to sue Defendant (Exhibit J, p. 3).

The website's list of charges against Defendant combines personal attacks with statements Defendant interpreted as references to homophobic stereotypes, including the following:

- Defendant is an uneducated gay male living with his "boyfriend" (p. 5);

- Defendant does not possess the skills, motivation or education to embark on a legitimate career (Exhibit J, p. 5);

- Defendant's actions are consistent with a narcissistic personality disorder. (Exhibit J, p. 6);

- Defendant's agenda appears to be motivated by pure hatred, jealousy and failure in life. (Exhibit J, p. 7);

- Defendant attempted to sue the doctor who treated his late sister because he "wanted a chance to bring his cherubic, effeminate yet self-proclaimed brilliant theatrics before a jury . . . [i]n the end, the tragic death of his sister became all about him and his histrionics" (Exhibit J, p. 11)

This website has since been taken down. Affidavit, ¶19.

By February 18, 2020, Defendant learned that Plaintiff had applied to the Board of Medical Licensure to reinstate his license to practice medicine. Affidavit, ¶21. Defendant does not believe a doctor who publishes defamatory and homophobic attacks online is fit to practice medicine, and he considered it appropriate to provide this information to the Board of Medical Licensure when reviewing any doctor's license. *Id.*

Defendant informed Plaintiff the he planned to report Plaintiff's previous threats to the Board of Medical Licensure, as he believed they raised questions about Plaintiff's fitness to practice medicine. Affidavit, ¶22. At Plaintiff's request, Defendant deferred taking this step. *Id.* Unfortunately, Plaintiff continued to issue threats against Defendant. *Id.*

On July 15, 2020, Defendant filed an online complaint with the Board of Medical Licensure expressing his concerns about Plaintiff's fitness to resume the practice of medicine. *See* Affidavit, ¶23 *and* Exhibit K thereto (copy of complaint).

The Patient Safety League's posting of Plaintiff is not unique. Other news reports concerning Plaintiff's automobile incident remain accessible on the world wide web, such as the following:

https://www.abc6.com/barrington-doctor-drives-car-into-liquor-store/

(Rhode Island ABC6 television news)

https://abc7news.com/archive/7970986/

(San Francisco ABC7 news)

https://www.dailymail.co.uk/news/article-1359274/One-road-drunk-driver-smashes-liquor-store-beer.html

(London Daily Mail)

https://www.youtube.com/watch?v=H7fd2Z8tDDY.

(INN News)

Affidavit, ¶24.

### D. The Complaint

The Complaint is a complex document that seeks relief under various theories of intentional tort and the Americans with Disabilities Act. With that said, the essential conduct of which it complains is primarily focused on the posting concerning Plaintiff that first appeared on the Bad Doctor Database and currently appears on the Patient Safety League website. *See, e.g.,* Complaint ¶18 ("The instant suit would not have been filed if the Defendant removed Plaintiff's name from his associated websites"); ¶65 ("Defendant Andrist previously by [sic] published

6

defamatory and injurious falsehoods on his Tumblr.com database"); ¶63 (second)[2], ¶89 ("the relief sought is to enjoin Defendant Andrist from using Plaintiff Grillo's name and identifying information on 4patientsafety.org web site, and all other social media platforms that the Defendant is associated with").

    II.    Argument

        A.    The Court should dismiss the Complaint pursuant to Rhode Island's anti-SLAPP statute, R.I.G.L. §§9-33-2.

The Court should dismiss the Complaint because it seeks judicial intervention and/or sanctions to discourage protected speech under Rhode Island's anti-SLAPP statute, R.I.G.L. §§9-33-2.

Rhode Island enacted this statute based on a legislative finding that

> full participation by persons and organizations and robust discussion of issues of public concern before the legislative, judicial, and administrative bodies and in other public fora are essential to the democratic process, that there has been a disturbing increase in lawsuits brought primarily to chill the valid exercise of the constitutional rights of freedom of speech and petition for the redress of grievances; that such litigation is disfavored and should be resolved quickly with minimum cost to citizens who have participated in matters of public concern.

R.I.G.L. §9-33-1.

The statute grants conditional immunity from civil claims that impair a party's exercise of the right to petition or of free speech under the United States or Rhode Island constitutions in connection with matters of public concern. R.I.G.L. §9-33-2(a).

The statute provides for one conditional exception, namely if the petition or free speech "constitutes a sham," which the statute defines as speech or a petition that is both:

---

[2]    The Complaint's enumeration of paragraphs goes from 1 to 70 (pp. 1-11), then from 56 to 107. The reference above is to the second ¶63, which appears on p. 12.

7

  (1) Objectively baseless in the sense that no reasonable person exercising the right of speech or petition could realistically expect success in procuring the government action, result, or outcome, and

  (2) Subjectively baseless in the sense that it is actually an attempt to use the governmental process itself for its own direct effects. Use of outcome or result of the governmental process shall not constitute use of the governmental process itself for its own direct effects.

*Id.*

As long as a "litigant could reasonably have expected a successful outcome" as a result of the speech, it is not objectively baseless. *Cov Rd. Dev. v. W. Cranston Indus. Park Assocs.*, 674 A.2d 1234, 1239. To find a petition or free speech subjectively baseless, a Court must find that the speaker "utilized the process itself rather than the intended outcome in order to hinder and delay [the other party]." *Pound Hill Corp. v. Perl*, 668 A.2d 1260, 1264 (R.I. 1996). To this writer's knowledge, Rhode Island courts have not yet found a petition or free speech subjectively baseless, *see, e.g. Karousos v. Pardee*, 992 A.2d 263, 269 (R.I. 2004).

The statute defines a party's exercise of petition or free speech as:

> any written or oral statement made before or submitted to a legislative, executive, or judicial body, or any other governmental proceeding; any written or oral statement made in connection with an issue under consideration or review by a legislative, executive, or judicial body, or any other governmental proceeding; or any written or oral statement made in connection with an issue of public concern.

R.I.G.L. §9-33-2(e). Rhode Island courts have held that the statute applies to such "issues of public concern" as complaints by a group of citizens to the newspaper concerning alleged environmental problems at a recycling plant (*see Global Waste Recycling v. Mallette*, 762 A.2d 1208 (R.I. 2000), a North Kingstown resident's participation in a Department of Environmental Management meeting and subsequent correspondence with state and federal officials criticizing the practices at a landfill (*see Hometown Properties v. Fleming*, 680 A.2d 56 (R.I. 1996)) or an

8

association's appeal of a zoning amendment allowing development of high-density residential housing adjacent to an industrial park (*see Cove Road Development v. Western Cranston Industrial Park Associates*, 674 A.2d 1234, 1239 (R.I.1996)).

The statute also provides that the Court shall stay discovery pending its review of the motion (§9-33-2(c)), shall award attorney's fees to a party that establishes a right to relief under this section (§9-33-2(d)), shall award compensatory damages (*id.*) and may award punitive damages if the respondent's "claims, counterclaims, or cross-claims were frivolous or were brought with an intent to harass the party or otherwise inhibit the party's exercise of its right to petition or free speech under the United States or Rhode Island constitution." *Id.*

Defendant's prior blogs and the posting he submitted to the Patient Safety League website qualify as an "exercise of [his] right of petition or of free speech" because it is a "written or oral statement made in connection with an issue of public concern." As noted before, they contain links to published media reports of Plaintiff's car crash into a liquor store, which led to a decision by the Board of Medical Licensure to suspend his license. Because the Board's decision was based on its determination of public safety, it follows that the website's presentation of the media reports and the Board of License decisions involve an "issue of public concern." Similarly, Defendant's complaint to the Board of Medical Licensure (Exhibit K) qualifies as a "written or oral statement made in connection with an issue under consideration or review by a legislative, executive, or judicial body, or any other governmental proceeding."

Because Defendant's actions qualify as protected free speech, the only remaining question is whether Defendant's database and/or complaint constitute a "sham" under the statute.

With regard to the database, it merely reproduces actual media reports that provided the basis for actual governmental action, which means it is not "objectively baseless." The database

9

also is not "subjectively baseless" because it advances Defendant's goal of informing the public of physician misconduct (for which he received an award in 2013) with factual information.

Defendant's complaint to the Board of Medical Licensure raised a legitimate issue (Plaintiff's threats against Defendant) concerning Plaintiff's fitness to practice medicine, was factually based on Plaintiff's statements on his retaliatory website and elsewhere, and thus is not "objectively baseless." The complaint to the Medical Licensure Board does not qualify as "subjectively baseless" because Defendant's blog posts and petition to the Board of Medical Licensure were directed towards questioning Plaintiff's fitness to practice medicine, rather than for the principal objective of creating delay and/or "red tape" from the proceedings themselves.

For these reasons, Defendant qualifies for conditional immunity under R.I.G.L. §9-33-2.

    B. <u>The Court should stay discovery.</u>

Pursuant to R.I.G.L. §9-33-2(c), the Court should stay discovery pending its review of this Motion.

    C. <u>If Defendant prevails, the Court should award damages and attorney's fees.</u>

Pursuant to R.I.G.L. §9-33-2(d), the Court shall award Defendant reasonable attorney's fees if Defendant establishes his right to immunity under this law. Also, should Defendant prevail, the Court should schedule a hearing on damages, as the statute provides that courts "shall award compensatory damages and may award punitive damages upon a showing by the prevailing party that the responding party's claims, counterclaims, or cross-claims were frivolous or were brought with an intent to harass the party or otherwise inhibit the party's exercise of its right to petition or free speech under the United States or Rhode Island constitution." *Id.*

III.     Conclusion

The General Assembly enacted Rhode Island's anti-SLAPP statute to protect the free speech rights of individuals to say things that powerful people could try to suppress through civil lawsuits.  In his retaliatory website, Plaintiff explained his plan to do exactly this.  Because Defendant's online posts were factual and sincerely motivated, they easily sail past the "sham" test that limits conditional immunity under R.I.G.L. §9-33-2.  The same is true for Defendant's complaint to the Board of Medical Licensure.

For these reasons, Defendant is entitled to full relief under the statute, namely a finding of conditional immunity, dismissal of the action and an award of damages and attorney's fees. Also, Defendant is entitled to a stay of discovery while the motion is pending.

                                              Respectfully submitted,

                                              Defendant Eric Lynn Andrist

                                              By his attorney,

                                              /s/ Samuel D. Zurier
                                              Samuel D. Zurier (#3576)
                                              55 Dorrance Street, Suite 400
                                              Providence, Rhode Island 02903
                                              (401) 861-0200; (401) 861-2922 (fax)
                                              sdz@zurierlaw.com

September 25, 2020

## **CERTIFICATE OF SERVICE**

  I hereby certify that on this 25th day of September, 2020, I served a copy of this Answer through the Court's CM/ECF system and by first class mail, postage prepaid, upon Plaintiff at the following address:

  Joseph Grillo
  73 Primrose Hill Road
  Barrington, RI 02806

  /s/ Samuel D. Zurier

U:\Andrist\Drafts\Andrist Memo to file.wpd