# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF RHODE ISLAND

JOSEPH GRILLO, *pro se*

Plaintiff


v.

ERIC LYNN ANDRIST,

Defendant

C.A. No. 2020-CV-0417-JJM-PAS
(R.I. Superior Court C.A. PC-2020-5326


## MEMORANDUM IN SUPPORT OF OPPOSITION TO DEFENDANT'S MOTION TO STAY DISCOVERY, DISMISS AND FOR DAMAGES AND ATTORNEY'S FEES

The defense is relying on Rhode Island's anti-SLAPP statute to halt this case. He claims that plaintiff is relying on judicial recourse to discourage "protected speech." Counting on R.I.G.L 9-33-2(a), he claims that this defendant is entitled to conditional immunity because his commentary is a "mater of public concern."

The plaintiff respectfully submits this memorandum. The evidence presented will be sufficient to withstand defense's motion to strike under Rhode Island's anti-SLAPP statutes.

Foundational to his argument(s), the defense points to a website that was allegedly published by the plaintiff. He claims this website existed in an attempt to quell the defendant's free speech rights. This claim is inaccurate.

Next, the defense argues that his assertions are matters of public concern. The facts presented demonstrate in the alternative – that the postings at issue are no longer matters of public concern and have not been so for years - or else eighteen separate news agencies would not have removed the story from their databases.

When weighing the competing interests of various parties and applying the *Pickering* balancing test[1] (discussed *infra*), the defense's interests are greatly outweighed by the combined interests of the plaintiff, the States of Rhode Island and California, and the federal government.

Foundational to the defense's anti-SLAPP motion is contention that the plaintiff presents causes of action that are frivolous and meritless. The reality is that each separate cause of action alleged by the plaintiff has a basis in both law and fact.

From the outset, the defense's reliance on anti-SLAPP is likely misplaced. This is not the sort of case that the Legislature intended to protect in enacting the law. These are private causes of action (as opposed to plaintiffs).[2] The plaintiff is not suing in retaliation. He is only seeking to have his name removed from the defendant's sites. This request would be ever so simple to comply with – and there is more than adequate justification to do so. The defendant has refused to do so. The issue is uniquely important to the Plaintiff (*see* Affidavit I, p. 3, ¶3). He does not wish to be involved in litigation but is left without any other option. Notwithstanding the unlikelihood that anti-SLAPP applies, the following is presented.

**1. The Plaintiff never "published" a "retaliatory website" against the Defendant.**

The defense mistakenly proffers that "plaintiff sent defendant a link to a retaliatory website plaintiff had commissioned and published." This statement is inaccurate.

---

[1] *See Pickering v. Board of Education* 391 U.S. 563 (1968).
[2] *Hoffman v. Davenport-Metcalf*, 851 A.2d 1083, 1088 (R.I. 2004)

The term "publish" has both technical and legal meanings. "Published" has been construed by the Courts to mean "published on publicly-accessible websites that a person searching the internet … might come across after a simple search."[3]

"In Internet publishing, information is generally considered "published" when it is made available to the public. Once information has been published on a website or print media, there is no further act required by the publisher to make the information available to the public."[4]

In *Penzer v. Transp. Ins. Co.*[5], the Court adopted a "plain meaning" approach to "publication" *which requires, at a minimum, there be a third-party view the content* (emphasis added).

Finally, the Restatement (Second) of Torts states (in part) as follows:

(1)     Publication of defamatory matter is its communication intentionally or by a negligent act to *one other than the person defamed.*
Restatement (Second) of Torts § 577 (emphasis added)

In the instant case, there was no actual publication (*see* Affidavit I, p. 6, ¶2). Furthermore, there was never a third-party to whom a publication was targeted.  The steps to publish a page of information are discrete and specific. Here, there was only a layout (stylized pages) that were merely "saved." The pages were created using the Wix tool. Here, there is an enormous difference between saving a page and "publishing" to the internet. Note that the page that is "saved" has a URL, which is the URL used for developing the page. The defense confuses this and chooses to claim that there was a "published" website when there was not (*id*. ¶3). Furthermore, the defendant used this as a justification to report the plaintiff to the medical board.

Even further, the page was only partially completed and presented to Defendant on February 4, 2020. Mr. Andrist had an exaggeratedly negative response. By February 7th, the notion of a

---

[3] *McClenaghan v. Turi*, 567 F. App'x 150, 152 (3d Cir. 2014).
[4] *Oja v. United States Army Corps of Eng'rs*, 440 F.3d 1122, 1124 (9th Cir. 2006).
[5] 29 So. 3d 1000 (Fla. 2010).

website was expressly and permanently renounced. Based on this, the Plaintiff made the decision to not proceed, and in the alternative to pursue legal recourse (*id*. ¶4-6). As stated in the affidavit, the use of a website was completely, fully, permanently and expressly (via multiple emails) renounced and withdrawn. This was clearly and accurately communicated to the defendant on multiple occasions.

In the end, a page (akin to a Word document) – which was not published - was under consideration for a total of three days and then expressly renounced.

The defense has failed to address any of the essential elements of publication outside of its use as a legal term of art. He would have this Court believe that an esoteric statement lay definition to the term, when the evidence is clear – there was never a website; there was a page shared with Mr. Andrist (and Mr. Andrist alone); and it was quickly removed from consideration. The defense fails to attest to whether the so-called publication was distributed, or the breadth of distribution. The unsupported, conclusory, and general attestation by the defense lacks probative value because they are conclusory allegations without specific supporting facts. (see *Kernel Records Oy v. Mosley*[6]). Needless to say, the defense's claim is in err.

It is difficult to conceive of how a person could not comprehend the facts as they exist. The defendant was made aware - multiple emails were sent. This could not have been clearer. Notwithstanding, he manipulated the facts; used them as a basis for espousing "genuine concern" and justification to report the plaintiff to the medical board. Given the timing (and his word choices) of his multiple complaints to multiple agencies, his actions were clearly retributive, nd even more clearly, not out of "concern" (*see* Affidavit I, p. 7-8). This is yet another example of how the defendant distorts the truth in favor of a contrived narrative. The evidence demonstrates

---

[6] 694 F.3d 1294, 1310-11 (11th Cir. 2012)

this as being a repeating pattern of behavior. The evidence further demonstrates that the defendant is far from married to the truth. Here, the defendant has created an alternative universe – one in which he ignores the facts of the case. In this case, he then crafted a cutting complaint to the BML, using the facts from his alternative universe as justification. His letter is laser focused to inflict harm.

All of this speaks to the defendant's emotional integrity and character. The defendant has fashioned an artform out of manipulating the facts into a false narrative and using them to justify his "benevolent" activities (*see* Exhibits H, L).  This is sine qua non for personality disorder. Here the defendant is cunning and manipulative – and is skilled at it.

As part of his argument, the defendant purposely draws upon incendiary words (colloquially referred to as "playing the gay card"), when there is nothing about his sexual orientation that is intended to be placed at issue. Specifically, he makes reference to statements contained within the document as being homophobic. This is a fact-based accusation – which is intended to communicate that the plaintiff has a dislike of or prejudice against homosexual people. In reality, all statements made were based on the defendant's specific behaviors. They reflect the defendant's demonstrated idiosyncratic assertions and responses derived from his various social media posts and accompanying videos. The plaintiff has spent over twenty years caring for HIV patients, most of who are homosexual. Accusations of homophobia are inaccurate.

### 2.   The Defendant's publications at issue are not matters of public concern

A foundational issue for an anti-SLAPP suit is that the alleged defamatory publication is a matter of public concern. As applied to this case, the Rhode Island anti-SLAPP statute requires that the speech must be in connection with a matter of public concern. Almost ten years have elapsed, and the story has become moot.

In adopting its anti-SLAPP statute, the legislature of Rhode Island found that:

> [F]ull participation by persons and organizations and robust discussion of issues of public concern before the legislative, judicial, and administrative bodies and in other public fora are essential to the democratic process … litigation is disfavored and should be resolved quickly with minimum cost to citizens who have participated in *matters of public concern*[7] (emphasis added).

The public concern question is pivotal in at least five different areas of modern communications law.[8] The area of law where "public concern" has been defined and applied is in public employment and employee's free speech rights. In *Snyder v. Phelps*[9] (discussed *infra*), Chief Justice Roberts cites cases from the domains of libel, intentional infliction of emotional distress, and government-employee speech. *Snyder's* definition of public concern continues to be applied to a myriad of different factual situations and legal theories.

*Snyder* is the seminal case on public concern doctrine.[10] In 2011 the Supreme Court held that free speech on a matter of public concern cannot be the basis of liability for an emotional distress claim.[11] Otherwise, in the context of public employees, free speech protection only extends to speech on matters of public concern.[12]

<u>Matter of Public Concern – The Supreme Court's Mandate</u>

When the Court issued its March 2011 decision in *Snyder v. Phelps*[13] protecting the First Amendment speech rights of members of the Westboro Baptist Church (WBC) near the funeral held for Matthew Snyder, a soldier killed in Iraq - it fashioned a framework for determining when speech involves a matter of public concern.

---

[7] R.I. Gen. Laws § 9-33-1 (2011) (emphasis added); see also id. § 9-33-2 (providing, in relevant part, that "a party's exercise of his or her right of petition or of free speech under the United States or Rhode Island constitutions in connection with a matter of public concern shall be conditionally immune from civil claims, counterclaims, or cross-claims").

[8] *See* Dan Laidman, *When the Slander Is the Story: The Neutral Reportage Privilege in Theory and Practice*, 17 UCLA Ent. L. Rev. 74, 89 (2010).

[9] *Snyder v. Phelps,*131 S. Ct. 1207 (2011).

[10] *Id.* at 1219.

[11] *id.* at 1223.

[12] *Connick v. Myers*, 461 U.S. 138 (1983).

[13] *Snyder*, 131 S. Ct. at 1217.

In brief, the court draws a distinction between the public (i.e. matter of public concern) and private realms.[14] The line delineating the two is anything but bright. In *Snyder*, Chief Justice Roberts provides a definition and corresponding set of factors to determine what constitutes a matter of public concern.

To determine if speech was about a matter of public or private concern, Chief Justice Roberts made it clear that the inquiry must be highly fact specific, taking into account "all the circumstances of the case."[15] He then framed a test under which a matter of public concern exists under two different conditions: (1) Community Concern: the speech can be "fairly considered as relating to a matter of political, social, or other concern;"[16] (2) News Interest: the speech centers on "a subject of legitimate news interest; that is, a subject of general interest and of value and concern to the public."[17] Next, the Court articulated a set of mandatory factors that courts are required to consider when deciding if speech involves a matter of public concern, namely: (1) content of the speech; (2) form of the speech; and (3) context of the speech.[18] "[i]n considering [these factors] no factor is dispositive, and it is necessary to evaluate all the circumstances of the speech, including what was said, where it was said, and how it was said."[19] The first part of this sentence is very important because it embraces a totality of the circumstances approach.

The Court's phrase "where it was said" factor certainly appears to be relevant as one aspect--a geographic or spatial one--of the context of the speech. The "how it was said" factor relates to the media of communication, such as print, broadcast or Internet.

<u>Legitimate news interest</u>

---

[14] *See id*. (presenting briefly public/private distinction).
[15] *Snyder*, 131 S. Ct. at 1218.
[16] *See id*. (quoting *Rankin v. McPherson*, 483 U.S. 378, 387 (1987)).
[17] *Id*. (quoting *City of San Diego v. Roe*, 543 U.S. 77, 83- 84 (2004)).
[18] *See id*. ("Deciding whether speech is of public or private concern requires us to examine the 'content, form, and context' of that speech ....") (quoting *Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc.*, 472 U.S. 749, 761 (1985)).
[19] *Id*.

Of note is that the Chief Justice Roberts frames a matter of public concern in the context of being a "*legitimate news interest*." It is an important statement in that it has legal ramifications. It points to news worthiness as being a proxy for public concern. While perhaps not precise, it continues to be applied by the courts. Indeed, what comprises a matter of public concern and what constitutes news often overlap. For instance, a Florida statute that provides professional journalists with a qualified privilege not to disclose information, including the identity of any source, obtained while actively gathering news actually defines news in terms of public concern: "'News' means information of public concern relating to local, statewide, national, or worldwide issues or events."[20]

Some have interpreted legitimate news interest as being a subject of general interest and of value and concern to the public[21] … "*at the time of publication*" (emphasis added).[22] The important inquiry is whether the speech was designed to address the issue as a matter of public concern or to further the speaker's own private interest.[23] "… motive for speech ... is a factor that must be considered in determining whether speech is a matter of public concern."[24] The courts have generally been content with this arrangement.

Much of the law seems to be about drawing lines between concepts. Perhaps, when it comes to the question of whether speech constitutes a matter of public concern, the line between public and private is deliberately left ambiguous in order to provide courts with flexibility and legal leeway to make difficult judgments based on the unique facts of each case.

The content, form, and context of the speech in the case at bar goes beyond any matter of political, social, or other concern to the community; it is no longer the subject of legitimate news

---

[20] Fla. Stat. § 90.5015 (2011).
[21] *See Amalgamated Transit Union v. Chattanooga Area Reg'l Transp. Auth.*, 431 F. Supp. 3d 961, 968 (E.D. Tenn. 2020)
[22] *See City of San Diego v. Roe*, 543 U.S. 77, 84, 125 S. Ct. 521, 160 L. Ed. 2d 410 (2004).
[23] *See id.*
[24] *Id.* at 1193.

interest. Its value as such has passed. When it passed is a grey area. At some point along the way, the federal government affords an array of protections to the plaintiff under the auspices of the Americans With Disabilities Act.

In terms of news worthiness – the defendant's publication *at the present time* – is not newsworthy and not a matter of public concern. As previously discussed, the Plaintiff contacted eighteen news agencies who reported on the plaintiff's arrest, and the story was available via the internet.  All eighteen agencies – after considerable inquiry – removed the story. They did so – partially out of being humane, but equally because the story was no longer relevant, necessary or important to society. Part of their calculus was the amount of time that had transpired. Indeed, many news agencies required that the case be sealed. Their rationale was that, in order to have records sealed, at least six years must have transpired. In addition, most news agencies look at the totality of the circumstances. This is true, because their decision-making always involved their editorial and legal departments. Their decision was discretionary. In all cases, the determination was that the story was moot and it was deleted from their databases.

As to content/form/context, it is clear based on the evidence presented that Mr. Andrist's motives are not patient safety/consumer awareness driven (*see generally* Affidavit II) –they are likely nefarious in that they have a malicious component. The evidence also shows that Mr. Andrist's actions are in violation of the law – that he is participating in activities that are expressly disallowed for a 501 (c)(3) charitable organization. (*See* Affidavit II, p. 15, ¶3, Exhibit K). Further, he either knows or should know of this. Mr. Andrist utilizes physicians who have faced challenges for his personal gain – that being to promote and market his brand. He is rigid and non-forgiving. He is not charitable or kind. Given the circumstances – why would he deny the Plaintiff's request? It is not the behavior of a professional. It speaks to a person who is mean-

spirited and vengeful. Why would he not do so for the sake of an innocent child who is being

bullied – particularly when he himself claims to have been bullied?

Application of the <em>Pickering v. Board of Education</em>[25]

*Pickering* involved a teacher who was critical of the board of education for their handling of

fiscal matters, and who expressed those concerns in a letter to the editor of the local

newspaper.[26] The school board responded by dismissing him.[27]

The Supreme Court held that Pickering's speech was protected by the First Amendment after

determining that his speech was "of public concern" and laid out what has since become known

as the Pickering balancing test:

> "The problem in any case is to arrive at a balance between the interests of the teacher, as
> a citizen, in commenting upon matters of public concern and the interest of the State, as
> an employer, in promoting the efficiency of the public services it performs through its
> employees."[28]

Under *Pickering*, even if an employee speaks as a citizen on a matter of public concern, the

Court must still determine whether the interest of the employee or government should prevail.[29]

This determination "depends on a careful balance 'between the interests of the [employee], as a

citizen, in commenting upon matters of public concern and the interest of the State, as an

employer, in promoting the efficiency of the public services it performs through its

employees.'"[30]

---

[25] 391 U.S. 563 (1968).
[26] *Id*. at 564.
[27] *Id*.
[28] *Id*. at 568.
[29] *Id*. at 571.
[30] *Id*. at 572-74

The Pickering balancing test has been applied to a large number of employee-free speech cases,[31] the most recent Supreme Court case being *Lane v. Franks,*[32] a case that expanded public employee free speech doctrine. Once again, the goal is to find a balance between the competing interests.[33] The courts have applied the Pickering balance outside the employment realm. For instance, in the context of freedom of expression and homosexual relations, came *Bowers v. Hardwick.*[34] This case required the court to weigh the plaintiff's intimate association right against Bowers' interest as a government employer in the effective functioning of the Attorney General's office.[35]

The instant case presents a number of interests. They include the States of California and Rhode Island, plaintiff, defendant, and the federal government. The plaintiff's interests are known. He seeks to have the speech in question removed. His interests relate to his ability to find employment and not be burdened the defendant's outdated website posts. He seeks to not be pre-judged based on an outdated posting. The argument has been made that the post is moot – that it is no longer of interest to the public – particularly those who reside outside of Rhode Island. The only time that the post is referenced is by potential employers – the net effect is that the plaintiff is summarily disqualified from consideration for a job, even though he may be otherwise qualified.

The defendant's interest is his own personal pecuniary and other nefarious gains – veiled in a patient safety justification – which is operated illegally and is otherwise a façade.

---

[31] *See Boring v. Buncombe Bd. of Educ.,* 136 F.3d 364, 372-73 (4th Cir.), cert. denied, 119 S. Ct. 47 (1998); *Bradley v. Pittsburgh Bd. of Educ.,* 910 F.2d 1172, 1176 (3d Cir. 1990); *Kirkland v. Northside Indep. Sch. Dist.,* 890 F.2d 794 (5th Cir. 1989); Nicholson v. Board of Educ. Torrance Unified Sch. Dist., 682 F.2d 858, 865 (9th Cir. 1982); *Goldwasser v. Brown,* 417 F.2d 1169, 1176-77 (D.C. Cir. 1969); *Garcetti v. Ceballos,* 547 U.S. 410 (2006); *San Diego v. Roe,* 543 U.S. 77 (2004).
[32] 134 S. Ct. 2369 (2014).
[33] *Pickering* 391 U.S. at 570.
[34] *Bowers v. Hardwick,* 760 F.2d 1202 (11th Cir. 1985), rev'd, 478 U.S. 186 (1986).
[35] *Id.* at 114 F.3d at 1101.

With respect to defendant, the facts and evidence make clear the following:

1.  The evidence is overwhelming - the defendant is emotionally labile. For instance, emotionally stable individuals generally do not get into fist fights with delivery drivers (*see* Exhibit Q). The list of documented instances that demonstrate emotional instability is endless.

2.  He intentionally hid his identity when he published on Tumblr. He has harmed reputations, jobs have been lost, and lives have been damaged.

3.  He claims to be a patient safety advocate, but his acts are not consistent with the title.

4.  The defendant's character is suspect – as he is willing to be overtly dishonest and to otherwise change facts and truths to suit his immediate agenda (*see* Exhibit H).

5.  The defendant's daily business activities are against California law. He violates the rules for a 501 (c)(3) charitable organization (*see* Affidavit II, p. 3, ¶7).

6.  The evidence shows that the defendant "has an axe to grind" (see Exhibit Q), he is mean-spirited, vengeful and lacks empathy.

The defendant's acts are rigid and vindictive. Unlike other professional institutes, he has no process for eliminating posts – and no interest in establishing one. By his own words, he can do anything with his blog that he wants to (see Exhibit Q). In his eyes, it does not matter that a post is no longer a matter of public concern – he intends for it to live in perpetuity.  No matter what the person on the opposite end accomplishes, he will be burdened forever if the defendant prevails in this matter. This is a perversion of the First Amendment. This is nothing more than a morbid indulgence to satisfy the defendant's appetites for power, control and vengeance. In a real sense, the defendant is hiding behind his (illegally operated) corporate veil.

The State of Rhode Island has an interest in the outcome. Rhode Island has the responsibility for protecting its citizens. The Rhode Island Board of Medical Licensure and Discipline (BMD) is regarded as being both effective and fair. They have a robust administrative disciplinary process. While not perfect, they effectively balance societal and physician interests. Frequently, the BMD will provide physicians with substance use disorder the opportunity to take remedial measures after which they provide opportunity to re-enter the work community. Rhode Island provides a robust and easy to use database query system whereby access to detailed disciplinary information is readily available. This is in a setting where there is a dire shortage of physicians in Rhode Island. Again, there is no gain in further shaming physicians by re-publishing information that has already been published and remains readily accessible. Rhode Island therefore has an interest in protecting its physicians who were formerly impaired and seeing to their eventual return to safe practice. Hence, their interest is in protecting its citizens, physicians and providing for a sufficient number of physicians to care for the residents of Rhode Island. Rhode Island would view the defendant's actions as being harmful.

The federal government has interest in preserving federal law including federal IRS code. Their other mandate is the American's With Disabilities Act. Here, just like the American Medical Association and others, the government has correctly categorized alcoholism as a medical illness. As such, once recovery is under way, the person with substance use disorder (of which alcoholism is one subtype) is afforded a number of stringent protections – namely against any form of discrimination, wherever it may occur.

The State of California may also have an interest in this matter. The State of California is nationally recognized as having the premiere medical board in the nation. The Medical Board of California (MBC) licenses and disciplines physicians and allied healthcare professionals in

California. It is the most populous state in the union with the greatest number of doctors (approximately 200,000).[36] Its board is well staffed, but the volume of disciplinary cases often demands the combined efforts of both medical board investigators and officers from the state Department of Investigation. These officers handle both the medical board overflow as well as any cases likely to involve criminal charges. The California Attorney General's office is often involved as well - assigning deputy attorneys general whenever a case in opened.[37] The California Medical Board has a large mandate – yet they represent the standard against which others are modeled.

The California Medical Board has been under continuous, random attack by the defendant. To date, the defendant has made no contributions in terms of patient safety, but instead has been inappropriately accusatory and defamatory. The Board has been victimized by an onslaught of misinformation. Their interest, therefore, would be to have the defendant's actions harnessed and quelled relative to baseless claims and accusations. They would likely view this action, if the plaintiff prevails, as being appropriate and beneficial.

3.  **The plaintiff's presents numerous claims, all of which have merit**

As previously discussed, the anti-SLAPP statute was enacted to prevent vexatious lawsuits against citizens who exercise their First Amendment rights of free speech and legitimate petitioning by granting those activities conditional immunity from punitive civil claims."[38]

In *Palazzo v. Alves*[39], the court pointed out that there is a balance that must take place with respect to the applicability of the anti-SLAPP statute.

> "the anti-SLAPP statute pit[s] two sets of fundamental constitutional rights against each other: (1) defendants' rights of free speech and petition and (2) plaintiffs' rights of access

---

[36] *id.*
[37] *id.*
[38] *Alves v. Hometown Newspapers, Inc.,* 857 A.2d 743, 752 (R.I.2004).
[39] 944 A.2d 144 (R.I.2008),

to the judicial system and rights to non-falsely maligned reputations. Plaintiffs must be able to bring suits with reasonable merit …."[40]

Thus, the anti-SLAPP statute should "be limited in scope," and "[g]reat caution should be the watchword in this area."[41]  With that in mind, we turn to the merits of America's anti-SLAPP affirmative defense.

Finally, "speech will not enjoy protection if it "constitutes a sham," meaning that it is "not genuinely aimed at procuring favorable government action, result, or outcome, regardless of ultimate motive or purpose."[42]

<u>The plaintiff's defamation claim is not frivolous.</u>

Of the causes of action that the plaintiff proffers, the defamation claim will be most challenging to pursue. The others are most clearly not frivolous. With respect to defamation, the following is a framework.

First, defendant Andrist's posts are defamatory. The defendant habitually posts defamatory messages (*see* Affidavit II, p. 13). There are hundreds of examples.

The defendant's referral to the plaintiff in the context of being a repeat criminal is a factual matter that can be proved at trial.

The defendant authored letters to various agencies, including the BML of Rhode Island in which he references a "published web-site" and accuses the plaintiff of being homophobic and guilty of hate crimes. The letter contains a combination of statements of opinion and fact. There is case law that addresses such statements in the context of defamation.

---

[40] *Id.* at 150 n. 11 (quoting John C. Barker, *Common–Law and Statutory Solutions to the Problem of SLAPPs,* 26 Loy. L.A. L.Rev. 395, 397–98 (1993)
[41] *Id.* at 150, 150 n. 10.
[42] *Id.*

The defendant has published plaintiff under the heading of "Bad Doctor" – which was in black and red (meaning it was accentuated).

This represents a "grey area" that has been addressed by the courts. Briefly, defamation may occur by omission, inference, or by meaning. In a defamation by omission case, the plaintiff must show with respect to the element of falsity that the communication left a false impression that would be contradicted by the inclusion of omitted facts.[43]

"A broadcaster's omission of facts may be actionable as defamation if it … distorts the viewers' perception …"[44] The context of a statement may be determined to have "defamatory meaning."[45]

In the instant case, like in *Franklin Prescriptions*, the defendant posts the plaintiff's information in a way that can be construed by an objective viewer as having defamatory meaning. It implies that the plaintiff is a bad doctor along with others who are charged with criminal and sexual offenses. This is false because the plaintiff has a medical condition (substance use disorder). He is an alcoholic – and more to specifically, he is a recovering alcoholic (substance use disorder in remission). This is a bona fide illness and does not by itself reflect on whether he is a bad doctor.

Hopefully the court will agree with the plaintiff –this case has merit and deserves to be heard.

At stake is a great deal in this case. To deny this case will be to allow someone from across the country have too great of an influence on the life and a person who he has never met. A person who operates under the rights and benefits of a charitable organization, who operates

---

[43] *Mohr v. Grant*, 153 Wash. 2d 812, 108 P.3d 768, 773, 33 Media L. Rep. (BNA) 1919 (2005) (newspaper defamation).
[44] *Huckabee v. Time Warner Entertainment Co. L.P.*, 19 S.W.3d 413, 425, 28 Media L. Rep. (BNA) 2158 (Tex. 2000), declined to extend on other grounds by *Cerberus Intern., Ltd. v. Apollo Management, L.P.*, 794 A.2d 1141, 1148 (Del. 2002).
[45] *See Franklin Prescriptions, Inc. v. The New York Times Co.*, 267 F. Supp. 2d 425, 32 Media L. Rep. (BNA) 1229 (E.D. Pa. 2003) (applying Pennsylvania law), found that the lower court had properly refused to grant summary judgment to a newspaper company for an article posted on its Web site that included a printout of the plaintiff pharmacy's Web site … appearing next to a side bar where the article focused on unscrupulous pharmacies.

16

illegally – should not be allowed to hide behind this illegal veil. The plaintiff prays for the court to intervene and provide relief.

Respectfully submitted,

Personally signed:

_____
JOSEPH GRILLO, M.D., *pro se*
73 Primrose Hill Road
Barrington, Rhode Island 02806
(401) 406-0012
Jfgrillo1@gmail.com

Dated: October 21, 2020

## CERTIFICATE OF SERVICE

I hearby certify that on October 21, 2020, I served a copy of this Memorandum in Opposition to Defendant's Motion to Stay Discovery, Dismiss And For Damages And Attorney's Fees - through email (Plaintiff's electronic filing privileges are pending) and by first class mail, postage prepaid, upon Defendant's counsel at the following address:

Attorney Samuel D. Zurier
55 Dorrance Street, Suite 400
Providence, Rhode Island 02903

Personally signed:

_____
JOSEPH GRILLO, M.D., *pro se*