# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF RHODE ISLAND

JOSEPH GRILLO, *pro se*

Plaintiff


v.

ERIC LYNN ANDRIST,

Defendant

C.A. No. 2020-CV-0417-JJM-PAS
(R.I. Superior Court C.A. PC-2020-5326


## MEMORANDUM IN SUPPORT OF PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

### Background

American jurisprudence does not generally reward an individual who breaks its laws. The defendant is doing just that. Making matters worse, he is attempting to hide behind this illegal veil in doing the proffered harms to the defendant. His illegal conduct should preclude him from prevailing and maintaining the status quo. Every day, his operations are purposeful and violate the laws governing 501(c)(3) Charitable Organizations. His activities have no charitable purposes. Since he is actions are illegal, he should not be permitted to continue. The plaintiff respectfully requests that the defendant be ordered to remove the plaintiff's name and identifying information from his website (www.4patientsafety.org), at least temporarily until this Court can

come to a final determination. In addition, the defendant should be ordered to cease and desist (shut down his website) until a final determination is made.

### The Defendant is acting in violation of the 501(c)(3) laws and should not be allowed to continue publishing his website.

Rule number one - an organization must organize itself and operate "exclusively" for a tax-exempt purpose that is enumerated in § 501(c)(3) of the IRC.[1] The exempt purposes set forth in section 501(c)(3) are charitable, religious, educational, scientific, literary, testing for public safety, fostering national or international amateur sports competition, and preventing cruelty to children or animals.[2]

The rules are very specific and exacting. It must operate "exclusively" for an enumerated purpose. It would be difficult to misconstrue the rules. Here, the defendant and his organization does not come close to conducting itself according the criteria for a charitable organization as painted by the legislature. The evidence is clear. The defendant's organization is not "exclusively engaged in carrying on charitable activities," in fact it is difficult to identify even a single charitable activity. It would be one thing if the organization was engaging in at least some semblance of charity; however, this organization is overwhelming favoring non-charitable activities. The evidence further suggests that he likely never intended to do so in the first place – which speaks to fraud.

A charitable organization should not reap the benefits of tax-exempt status when it operates outside of statutory boundaries. Nor should a defendant be able to use such an

---

[1] *See Am. Campaign Acad. v. Comm'r*, 92 T.C. 1053, 1061-62 (1989) (listing criteria that are necessary fr an organization to qualify for § 501(c)(3) status). Congress imposed these four criteria for a specific public-policy reason; Congress does not want tax-exempt organizations using "tax-deductible contributions to lobby to promote the private and political interests of their members." *Regan v. Taxation with Representation of Wash.*, 461 U.S. 540, 550 (1983). *See also Christian Echoes Nat'l Ministry, Inc. v. United States*, 470 F.2d 849, 854 (10th Cir. 1973) (stating that the U.S. "Treasury should be neutral in political affairs and ... *substantial activities directed to attempts to influence legislation or affect a political campaign should not be subsidized*" (emphasis added)).

[2] *Id*. at 50.

organization to participate in a non-exempted activity when that very activity is tortious and serves to inflict harm.  In addition, the non-exempted, illegal activity is one that selects out and punishes the defendant and others, and this very act is also discriminatory against a member of a protected group (as spelled out in the Americans With Disabilities Act).[3] Finally, the defendant's acts are a destructive force –for the plaintiff and other physicians in recovery, the States of Rhode Island and California, and the federal government.

In his Articles of Incorporation, the defendant states as his purpose "[the] offering charitable guidance to victims of medical error." This is an overtly fraudulent statement. The defendant does nothing of the kind. This statement would (mis)lead the reasonable person to believe that the defendant provides something akin to one-on-one assistance, when in fact, he provides no charitable guidance whatsoever. Here, the evidence already presented to date is unequivocal. In fact, this author was not able to find a single instance of charitable guidance. (*See generally* Memorandum in Support of Opposition to Defendant's Motion to Stay Discovery, Dismiss and For Damages and Attorney's Fees).

Instead, he performs functions – none of which are an "exempted activity" and are disallowed – namely publishing a database of physicians who have come under review; attacking the California Medical Board (typically with baseless and bizarre accusations); and spending a great amount of time attempting to influence Legislation (MIRCA tort reform). One only needs to peruse his website (www.4patientsafety.org). The predominant topics are (a) the physician database; (b) activities that attack the California Medical Board; and (c) tort reform (MIRCA).

---

[3] *See Bob Jones Univ. v. United States*, 461 U.S. 574, 592 (1983). ("A charitable organization must "be in harmony with the public interest" and its purpose 'must not be so at odds with the common community conscience as to undermine any public benefit that might otherwise be conferred.'")

None of these are listed in his Articles. The defense will likely state that he provides an educational function, which is his only conceivable argument - but this argument will fail.

## The Patient Safety League will fail in arguing it performs an educational function

An organization seeking an educational exemption must submit an IRS Form 1023 (Application for Recognition of Exemption Under Section 501(c)(3) of the Internal Revenue Code). Form 1023 requires the organization to demonstrate that it is organized and operated exclusively for charitable purposes, and that any non-exempt purpose is incidental and not substantial to its operation.[4] The exempt purposes set forth in section 501(c)(3) are charitable, religious, educational, scientific, literary, testing for public safety, fostering national or international amateur sports competition, and preventing cruelty to children or animals.[5]

The term charitable is used in its generally accepted legal sense and includes relief of the poor, the distressed, or the underprivileged; advancement of religion; advancement of education or science; erecting or maintaining public buildings, monuments, or works; lessening the burdens of government; lessening neighborhood tensions; eliminating prejudice and discrimination; defending human and civil rights secured by law; and combating community deterioration and juvenile delinquency.[6]

## 501(c)(3) Organizations: What Qualifies as "Educational"?

The defendant's only conceivable justification to exist as a "501(c)(3) organization" is claim that it provides the public with "education."

---

[4] *United States v. Mubayyid*, 476 F. Supp. 2d 46, 49 (D. Mass. 2007)
[5] *Id*. at 50.
[6] Exempt Purposes – IRS Code Section 501(c)3). https://www.irs.gov/charities-non-profits/charitable-organizations/exempt-purposes-internal-revenue-code-section-501c3

Indeed, educational organizations qualify for tax-exempt status as entities described in Section 501(c)(3) of the Internal Revenue Code (IRC).[7] Benefits that the defendant partakes arising from 501(c)(3) status include exemption from federal income taxes and eligibility to receive tax-deductible contributions.[8]

There is no statutory definition of the term "educational" in the IRC. Rather, the term is defined by a Treasury regulation. It defines "educational" to encompass both (1) individual instruction "for the purpose of improving or developing his capabilities," and (2) "[t]he instruction of the public on subjects useful to the individual and beneficial to the community."[9]

The regulation goes on to address the heart of the matter about the term's scope:

> An organization may be educational even though it advocates a particular position or viewpoint so long as it presents a sufficiently full and fair exposition of the pertinent facts as to permit an individual or the public to form an independent opinion or conclusion. On the other hand, an organization is not educational if its principal function is the mere presentation of unsupported opinion.[10]

The regulation also provides examples of educational organizations, including schools of every educational level; groups that hold public forums and lectures; and museums and zoos.[11]

To determine if an activity is educational, the Treasury provides two tests. An organization that advocates a position can qualify as educational if it presents "a sufficiently full and fair exposition of the pertinent facts" so that people can form their own opinions or conclusions. To

---

[7] IRC §501(c)(3)(describing organizations "organized and operated exclusively for religious, charitable, scientific, testing for public safety, literary, or educational purposes, or to foster national or international amateur sports competition ... or for the prevention of cruelty to children or animals, no part of the net earnings of which inures to the benefit of any private shareholder or individual, no substantial part of the activities of which is carrying on propaganda, or otherwise attempting, to influence legislation ... and which does not participate in, or intervene in ... any political campaign on behalf of (or in opposition to) any candidate for public office").
[8] *See* IRC §§501(a), 170(c)(2).
[9] Treas. Reg. §1.501(c)(3)-1(d)(3)(i).
[10] *Id.*
[11] Treas. Reg. §1.501(c)(3)-1(d)(3)(ii) (providing 4 examples: (1) an organization (e.g., a primary or secondary school, college, or professional or trade school) with a regularly scheduled curriculum, a regular faculty, and a regularly enrolled student body in attendance at a place where the educational activities are regularly carried on; (2) an organization whose activities consist of presenting public discussion groups, forums, panels, lectures, or similar programs; (3) an organization that presents a course of instruction by means of correspondence, television, or radio; and (4) museums, zoos, planetariums, symphony orchestras, and similar organizations).

supplement the regulation's "full and fair exposition" standard, the Internal Revenue Service (IRS) has developed the "methodology test."[12]

In 1986, the Internal Revenue Service (IRS) developed the "methodology test." The test assists in determining whether the method used by an organization to communicate a particular viewpoint or position is educational. Under the test, a method is not educational if it fails to provide a "factual foundation" for the position or viewpoint or "a development from the relevant facts that would materially aid a listener or reader in a learning process."[13] The IRS has identified four factors that lead to the conclusion the method is not educational:

- a significant portion of the group's communications consists of the presentation of viewpoints or positions that are unsupported by facts;

- facts that purport to support the viewpoints or positions are distorted;

- the group's presentations make substantial use of inflammatory and disparaging terms and express conclusions based more on strong emotional feelings rather than objective evaluation; and

- the presentation's approach is not aimed at developing the audience's understanding of the subject matter because it does not consider their background or training.[14]

Absent exceptional circumstances, the presence of any one of these factors indicates the organization's method of communicating its views does not meet the criteria to be "educational."[15]

---

[12] *Id.*
[13] Rev. Proc. 86-43, 1986-2 C.B. 729. A revenue procedure is "a statement of procedure that affects the rights or duties of taxpayers or other members of the public under the Code and related statutes or information that, although not necessarily affecting the rights and duties of the public, should be a matter of public knowledge." Treas. Reg. § 601.601(d)(2)(i)(b).
[14] *See* Rev. Proc. 86-43, 1986-2 C.B. 729.
[15] *See id.*

There is relatively little case law or IRS rulings on the "full and fair exposition" test. A group advocating for the use of alternative schools was found to have met the methodology test when it (1) made publicly available copies of all the briefs, including those of the opposing parties, filed in relevant legal actions; (2) encouraged those with different viewpoints to submit articles to its newsletter; and (3) provided information on a subject that was useful and beneficial to the public.[16]

On the other hand, the Tax Court held that a group purportedly "dedicated to advancing American freedom, American democracy and American nationalism" did not qualify as educational when its newsletters were filled with inflammatory language and unsupported conclusions.[17]

The court found the newsletters failed the first, third, and fourth factors in the methodology test.[18] They failed the first factor because a significant portion presented viewpoints that were clearly not supported by facts.[19] The court had no trouble finding the third factor was met, as the newsletters were filled with inflammatory and disparaging terms for gays and African Americans, among others.[20] Finally, the court found that the fourth factor was met because a significant portion of the newsletters' intended readership were young people who would likely have little knowledge about the historical events presented in the newsletters, and the newsletters' negative treatment of these events would not assist in the readers' understanding of them.[21]

---

[16] *See National Association for the Legal Support of Alternative Schools v. Comm'r*, 71 T.C. 118 (1978).
[17] *Nationalist Movement v. Comm'r*, 102 T.C. 558, *4 (April 11, 1994).
[18] *Id.* at 73-75.
[19] *See id.* at 76-77.
[20] *See id.*
[21] *See id.* at 77-78.

An example where an organization failed to meet the "full and fair exposition" standard

was one formed to "promote the education of the public on patriotic, political, and civic matters,

and to inform and alert the American citizenry to the dangers of an extreme political doctrine."[22]

The group distributed written materials (e.g., books, pamphlets, and newsletters) and

operated a speakers' bureau. The materials included substantial data about the doctrine's

activities. The problem was they also included

> many allegations and charges that certain individuals and institutions are of questionable
> national loyalty. Such charges are primarily developed by the use of disparaging terms,
> insinuations, and innuendoes and the suggested implications to be drawn from incomplete
> facts. For instance, the organization bases many of its conclusions on incomplete listings
> of an individual's organizational affiliations without stating the extent or the nature of the
> affiliations or attempting to present a full and fair exposition of the pertinent facts about
> those organizations.[23]

The IRS ruled that these types of activities were a substantial part of the organization's

overall activities, and therefore the group failed to be classified as educational.


The Patient Safety League Fails to Qualify As Providing Education

The Patient Safety League will fail each test. The exhibits associated with Addendum I

and Addendum II makes this proposition perfectly clear. Almost always, the defendant's

viewpoints consist of positions that are unsupported by facts, they are distorted – almost always

inappropriately accusatory and otherwise distorted and defamatory. The defendant's

presentations make substantial use of inflammatory and disparaging terms – i.e. making baseless

accusations such as receiving kickbacks and being corrupt. His conclusions are based more on

strong emotional feelings rather than objective evaluation; and the presentation's approach is not

---

[22] Rev. Rul. 68-263; 1968-1 C.B. 256
[23] *Id.*

aimed at developing the audience's understanding of the subject matter because it contains only one side of any given issue.

Examples of such statements taken from the Patient Safety League website includes the following.[24]

*DID THE MEDICAL BOARD LET YOU DOWN?*
*The Medical Board of California has been under fire since its inception over 100 years ago, and more severely in the last several decades.*

*they take in around 10,000 consumer complaints every year, yet they only discipline about 4% of them. That means that 96% of consumer's complaints are closed with no discipline.*

*Doctor responsible for the death of TV Judge Glenda Hatchett's daughter-in-law. He allowed her to bleed to death after a c-section at Cedars Sinai Hospital in Los Angeles. The Medical Board gave him a lighter sentence than their own guidelines call for.*

*The Medical ~~Board~~ Farce of California*

There are thousands of examples spanning six years and across multiple platforms. In total, there is very little, if any, content that would pass the Treasury's tests and qualify as educational.

Any organization that earns federal tax-exempt status under Section 501(c)(3) is highly regulated. The organization must adhere to the rules. Here, the defendant spends a great deal of his efforts attempting to influence tort reform. This – by itself – is a violation of the IRS Code. He does so by spewing hateful and baseless accusations against administrators and organizations – namely the California Medical Board.[25]

---

[24] https://4patientsafety.org/medical-board-of-california-blunders/
[25] *See generally,* Addendum II

Overall the term "charitable" means just that – the performance of acts in furtherance or assistance to those in need. There is nothing within the charter of a charitable organization that allows for the reporting of physicians who have come under scrutiny.

Mr. Andrist and The Patient Safety League operate fraudulently. Their efforts are concentrated on changing legislation and listing physicians in their database. His organization should he halted until the court rules permanently on the topic. As it stands, the defendant's alleged misrepresentations may include falsely soliciting funds in the name of a charitable organization, conspiracy to commit fraud and fraudulently obtaining a charitable exemption under § 501(c)(3) of the Internal Revenue Code.

<u>Preliminary Injunction</u>

The plaintiff respectfully requests this Court to issue a Preliminary Injunction against the Defendant, his attorney, officers, servants and agents, and all persons acting in concert with him requiring the defendant to (1) remove plaintiff's name and identifying information from all websites and internet social media platforms; (2) to cease and desist the operation of 4patientsafety.org.

<u>Standard of Review</u>

Rule 65 governs the issuance of preliminary injunctions and temporary restraining orders.[26]   In the First Circuit, courts employ the familiar four-part test for determining whether to grant requests for preliminary injunctive relief, "taking into account:

1.     The likelihood of success on the merits;
2.     The potential for irreparable injury;
3.     A balancing of the relevant equities (most importantly, the hardship to the nonmovant if the restrainer issues as contrasted with the hardship to the movant if interim relief is withheld); and
4.     The effect on the public interest of a grant or denial of the restrainer."[27]

The party seeking the preliminary injunction bears the burden of establishing that these four factors weigh in its favor.[28]

<u>The Plaintiff has reasonable likelihood of success on the merits.</u>

In showing a reasonable likelihood of success on the merits, the moving party need not establish a certainty of success.[29] Rather, the movant need only make out a prima facie case.[30]

---

[26] *See* Fed. R.Civ.P. 65.
[27] *Narragansett Indian Tribe v. Guilbert*, 934 F.2d 4, 5 (1st Cir. 1991) (citing *Aoude v. Mobil Oil Corp.*, 862 F.2d 890, 892 (1st Cir. 1988); *Hypertherm, Inc. v. Precision Products, Inc.*, 832 F.2d 697, 699 & n. 2 (1st Cir. 1987)).
[28] *Nieves-Marquez v. Puerto Rico*, 353 F. 3 d 108, 120 (1st Cir.2003).
[29] *DiDonato v. Kennedy*, 822 A.2d 179, 181 (R.I. 2003) (per curiam)
[30] *DiDonato v. Kennedy*, 822 A.2d 179, 181 (R.I. 2003) (per curiam); *Iggy's Doughboys, Inc. v. Giroux*, 729 A.2d 701, 705 (R.I. 1999); *Fund for Community Progress v. United Way of Southeastern New England*, 695 A.2d 517, 521, 25 Media L. Rep. (BNA) 2431, 43 U.S.P.Q.2d 1683 (R.I.

The case presents a number of causes of action – one of which is defamation. There is no doubt that the defendant is frequently defamatory in general but has also made defamatory statements in reference to the plaintiff – namely that he is a repeat criminal. There are other instances of defamation directed against plaintiff (*See* Memorandum in Support of Opposition to Defendant's Motion to Stay Discovery, Dismiss and For Damages and Attorney's Fees. P.14-17). The other causes of action are likely to succeed. Prima facie cases have been previously made out.

<u>The Plaintiff stands to suffer irreparable harm.</u>

As for irreparable harm, the movant must show that he stands to suffer some irreparable harm that is presently threatened or imminent and for which no adequate legal remedy exists to restore him to his rightful position.[31] "Prospective damage to … reputation 'is precisely the type of irreparable injury for which an injunction is appropriate.'"[32]

The Plaintiff has and continues to suffer harm that is real and tangible and based on hundreds of rejections (with supporting emails). The harm is irreparable. Potential employers continue to be influenced by the defendant's website. Once influenced, the effect is lasting and not reversible. Each day, potential employers who are contemplating the plaintiff for employment – view the defendant's website - the result being that the plaintiff has been unable to secure employment (*see* Affidavit I, p.3, ¶3). Prior to ever speaking to the plaintiff, the potential employer will Google-search my name (this sort of search is commonplace these days), he will view Mr. Andrist's posts, and immediately eliminate plaintiff from consideration. This is done

---

1997). Prima facie evidence is "that amount of evidence that, if unrebutted, is sufficient to satisfy the burden of proof on a particular issue." *Paramount Office Supply Co., Inc. v. D.A. MacIsaac, Inc.*, 524 A.2d 1099, 1101 (R.I. 1987).
[31] *Hebert v. City of Woonsocket by and through Baldelli-Hunt*, 2019 Employee Benefits Cas. (BNA) 245133, 2019 WL 2751844, *8 (R.I. 2019), as corrected, (Sept. 6, 2019); *Pucino v. Uttley*, 785 A.2d 183, 188 (R.I. 2001) (per curiam).
[32] *Fund for Cmty. Progress v. United Way of Se. New England*, 695 A.2d 517, 521 (R.I. 1997)

without ever speaking to plaintiff. This scenario has been proven out with hundreds of rejected applications, many of which point to Mr. Andrist's publication. It continues today, and without this injunction being granted – will continue in the future. The plaintiff is eliminated based on an event – a story and pictures that are ten years old. He is not given opportunity to present himself. He is unable to move ahead in the interview process beyond the initial inquiry. Otherwise, the plaintiff is arguably qualified for most positions applied for. He has always been an honors-student (including law school), he is well-published, and with a long and successful history of past employment – as an engineer, physician and law student. His demeanor is pleasant and professional. He is committed to recovery and is likely to remain sober. The defendant's website continues to do harm to the plaintiff. Those who view the defendant's site are permanently enshrined with a negative impression. The defendant's reputation continues to be harmed. To the extent that potential employers review the website, the plaintiff is irreparably harmed.

<u>The Balance of the Equities Weighs in Favor of the Plaintiff.</u>

The plaintiff is unable to secure employment. This seems stead-fast – including both employment as a physician and attorney. Not only is the plaintiff being harmed, so too is his family. He is primary provider his family and responsible to support them. Currently they are surviving on weekly unemployment insurance benefits. His wife is recovering from pancreatic cancer and two major surgeries. Her condition is tenuous. There are routine doctor visits and testing – all of which is costly. Plaintiff also has a 15-year-old son who also requires his support. The plaintiff is much more likely to gain employment if his name is removed from the defendant's website.

The defendant will not suffer whatsoever from a ruling in favor of plaintiff. He has thousands of names in his database, of which the plaintiff is just one. Removal of the plaintiff's name is a very simple matter for the defendant, and one that will not affect him at all.

<u>The public interest favors issuance of the Preliminary Injunction.</u>

The public's interest includes having its laws obeyed. The defendant has consistently conducted himself as though the rule of law does not apply to him. He openly states that he has an axe to grind and can do whatever he wants (see generally Affidavit II). It is hard to imagine that the defendant is not fully aware of his illegalities – because they are written in his Articles of Incorporation in black and white. Hence the interest in preventing fraud is manifest.

Public interest favors restoring a rehabilitated physician to a position of employment, without undue burdens. This is particularly the case in Rhode Island where there is a significant shortage of physicians.

<u>Conclusion</u>

For the forgoing reasons, the plaintiff respectfully requests that the defendant be enjoined by this Court from using plaintiff's name and identifying information on his website, and that the website cease and desist.

Respectfully submitted,

Personally signed:

_____
JOSEPH GRILLO, M.D., *pro se*
73 Primrose Hill Road
Barrington, Rhode Island 02806
(401) 406-0012
Jfgrillo1@gmail.com

Dated: October 23, 2020

## CERTIFICATE OF SERVICE

I hearby certify that on October 22, 2020, I served a copy of this Memorandum in Support of Preliminary Injunction - through email (Plaintiff's electronic filing privileges are pending) and by first class mail, postage prepaid, upon Defendant's counsel at the following address:

Attorney Samuel D. Zurier
55 Dorrance Street, Suite 400
Providence, Rhode Island 02903

Personally signed:

_____

JOSEPH GRILLO, M.D., *pro se*