UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

| | |
|---|---|
| JOSEPH GRILLO, *pro se* <br><br> Plaintiff <br><br> v. <br><br> ERIC LYNN ANDRIST, <br><br> Defendant | C.A. No. 2020-CV-0417-JJM-PAS <br> (R.I. Superior Court C.A. PC-2020-5326 |

**PLAINTIFF'S REPLY IN OPPOSITION TO DEFENDANT'S OBJECTION TO MOTION FOR PRELIMINARY INJUNCTION**

The defense claims that none of the Plaintiff's asserted claims are likely to succeed on the merits. The Plaintiff endeavors to chall enge this assertion and sets forth the following.

The Plaintiff incorporates by reference his previous discussion on the merits of the defamation claim. (*See* Memorandum in Opposition to Defendant's Motion To Stay Discovery, Dismiss and For Damages and Attorney's Fees, p. 16).

Intentional Infliction of Emotional Distress (IIED)

There is more than ample justification to support this cause of action. This claim is not made based on free speech as it relates to the Defendant's website. It is based on the Defendant's campaign of taunting the Plaintiff, and then continuously reporting the Plaintiff over a period of

1

years - to every conceivable agency with the intent of destroying the Plaintiff's bid for licensure and to achieve legitimacy within his field.

A distinguishing feature of IIED is that it is relatively new - it is still developing and is sufficiently flexible to address new situations that evolve.[1]

The central component of the tort, determining whether the defendant's conduct is extreme and outrageous, requires a contextual analysis. This contextual component further empowers courts with added flexibility.

In order to impose liability on a defendant for intentional infliction of emotional distress:

(1)     the conduct must be intentional or in reckless disregard of the probability of causing emotional distress,

(2)     the conduct must be *extreme and outrageous*,

(3)     there must be a causal connection between the wrongful conduct and the emotional distress, and;

(4)     the emotional distress in question must be severe.[2]

Again, the primary distinguishing feature of the tort is the requirement for "extreme and outrageous conduct." In fact, this element is, in large respect, the entire tort. It both limits the reach of the tort and dominates the proof of its elements.

Further, "at least some proof of medically established physical symptomatology is required for intentional infliction of mental distress."[3]

---

[1] *See, e.g., Bartanus v. Lis*, 480 A.2d 1178 (Pa. Super. Ct. 1984) ("[T]he intentional infliction of emotional distress is an evolving tort and its scope has not yet been clearly defined." (citing *Papieves v. Lawrence*, 263 A.2d 118, 121 (Pa. 1970))); RESTATEMENT§ 46 cmt. c ("The law is still in a stage of development .... This section states the extent of the liability thus far accepted generally by the courts. The Caveat is intended to leave fully open the possibility of further development of the law, and the recognition of other situations in which liability may be imposed."); KEETON ET AL., at 55 ("[T]he law is clearly in a process of growth, the ultimate limit of which cannot yet be determined.").
[2] *Swerdlick v. Koch*, 721 A.2d 849, 862 (R.I. 1998) (emphasis added) (quoting *Champlin v. Washington Trust Co. of Westerly*, 478 A.2d 985, 989 (R.I. 1984)).
[3] *Gross v. Pare*, 185 A.3d 1242, 1245–46 (R.I. 2018), *as corrected* (Aug. 16, 2018)

Rhode Island has adopted Restatement (Second) *Torts* § 46 cmt. *d* (1965), which provides, in pertinent part:

"Liability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency …."[4]

However "[b]ecause there is no universal litmus test by which to identify extreme and outrageous behavior, the determination is a fact-specific one."[5]

The Restatement identifies certain "plus factors" - considerations that bear on whether in a given case the defendant's conduct reached the level of actionability: (1) the defendant's occupying a position of authority or power over the plaintiff;[6] and (2) the defendant's awareness of some particular susceptibility of the plaintiff making him or her more vulnerable to suffer severe distress.[7]

"Intending to inflict emotional distress on another person whose susceptibility is known to the defendant is often outrageous."[8]

A third "plus factor" is a showing that the Defendant's behavior giving rise to the plaintiff's distress occurred repeatedly or persisted over a long period of time.[9]

---

[4] *see also Swerdlick*, 721 A.2d at 862.
[5] *Borden v. Paul Revere Life Ins. Co.,* 935 F.2d 370, 380 (1st Cir.1991).
[6] *See* Restatement of Torts 2d § 46, comment e:e. The extreme and outrageous character of the conduct may arise from an abuse by the actor of a position, or a relation with the other, which gives him actual or apparent authority over the other, or power to affect his interests.
[7] *See* Restatement of Torts 2d § 46, comment f:f. The extreme and outrageous character of the conduct may arise from the actor's knowledge that the other is peculiarly susceptible to emotional distress.
[8] Restatement (Second) of Torts, §46, Comment f (1965).
[9] *Latremore v. Latremore*, 584 A.2d 626 (Me. 1990), (The plaintiffs, an elderly couple, alleged that their son had behaved outrageously in by failing to honor a previous agreement to allow them to live rent-free in an apartment that he owned, and by insisting that they pay $3,000 per month in rent or face eviction. As part of their demonstration of outrageous conduct on the son's part, the plaintiffs produced evidence that he made multiple demands and threats in the course of the dispute).
*Agis v. Howard Johnson Co.,* 371 Mass. 140, 355 N.E.2d 315 (1976). (A Massachusetts case in which the employer, experiencing cash shortages, informed all its waitresses at a general meeting that there was some stealing going on but that the identity of the person or persons responsible was not known. The company had decided to begin firing all its waitresses in alphabetical order until the thief was discovered. The plaintiff, Debra Agis, was the first employee fired. In her complaint, she alleged that as a result of this incident, she became greatly upset, began to cry, and sustained emotional distress, mental anguish, and loss of wages and earnings. She also alleged that the employer's actions in this regard were reckless, extreme, outrageous, and intended to cause distress and anguish. The court agreed with the plaintiff that the case should not be dismissed but should proceed to trial on the merits of her claims).

Courts have viewed conduct as outrageous precisely because of its adverse effects on others (which is, after all, what makes conduct socially intolerable). Hence, the objective nature of defendant's conduct is emphasized rather than his or her subjective intent.[10]

Further, "[a] defendant who intentionally subjected another to mental distress without intending to cause bodily harm would nevertheless be liable for resulting bodily harm if he should have foreseen that the mental distress might cause such harm."[11]

Next, the conduct must be evaluated in light of the relationship between the parties. As previously noted, courts recognize this tort in a variety of relationships. Specifically, they focus on the relationship in light of the duties owed and the degree of vulnerability between the parties.[12] The Restatement advises that extreme and outrageous conduct "may arise from an abuse by the actor of a position, or relation with the other which gives him actual or apparent authority over the other, or power to affect his interests."[13] Rhode Island has shown no signs of limiting this cause of action to only a select few relationships.[14]

Additionally, the outrageousness of particular conduct "... may arise from the actor's knowledge that the other is peculiarly susceptible to emotional distress, by reason of some physical or mental condition or peculiarity."[15]

Finally, many jurisdictions consider retaliation in the context of a claim for intentional infliction of emotional distress is a "plus factor" and a major factor to used in assessing such a claim.[16]

---

[10] § 10:12. Elements of the tort—Extreme and outrageous conduct, 2 Stein on Personal Injury Damages Treatise § 10:12 (3d ed.)
[11] *Clift v. Narragansett Television L.P.*, 688 A.2d 805, 812 (R.I. 1996)
[12] *See Champlin v. Washington Trust Co. of Westerly,* 478 A.2d 985, 988–89 (R.I.1984).
[13] Restatement (Second) of Torts § 46 cmt. e at 74 (1965); *see also, e.g., Hailey v. California Physicians' Service*, 158 Cal. App. 4th 452, 69 Cal. Rptr. 3d 789 (4th Dist. 2007), as modified on denial of reh'g, (Jan. 22, 2008) and review denied, (Mar. 26, 2008); *Zalnis v. Thoroughbred Datsun Car Co.*, 645 P.2d 292 (Colo. App. 1982)).
[14] *Norton v. McOsker*, 407 F.3d 501, 509–10 (1st Cir. 2005).
[15] Restatement (Second) of Torts § 46 cmt. f at 75 (1965).
[16] *Hoy v. Angelone*, 554 Pa. 134, 720 A.2d 745 (1998).

4

There are many of cases where recovery was sanctioned that involve some sort of physical contact by the defendant.[17] This likely provides a "shock" value that helps put the case over that subjective line of outrageousness. On the other hand, there is a plethora of cases where there was no physical candidate and "outrageousness" was more subtle.[18] Here, the courts have held to a more liberal construction of the tort. The case law is abundant.

---

[17] *Castellucci v. Battista*, 847 A.2d 243 (R.I. 2004), (a homeowner who was assaulted by an armed intruder during a home invasion established a claim against the intruder for intentional infliction of emotional distress). *Continental Casualty Co. v. Garrett*, 173 Miss. 676, 161 So. 753 (1935), (a bullying insurance adjuster called on a sick person who became a plaintiff, called plaintiff a malingerer, and flung a 50¢ piece on the bedclothes, the court stressing both the trespass to plaintiff's home and a technical battery perpetrated). *Dickens v. Puryear*, 302 N.C. 437, 276 S.E.2d 325 (1981), (a plaintiff sought damages for intentional infliction of mental distress, alleging that he was handcuffed, beaten, and threatened with death and bodily injury).

[18] *Odom v. Fairbanks Memorial Hosp.*, 999 P.2d 123, 2000-1 Trade Cas. (CCH) ¶ 72829 (Alaska 2000) (a physician sought damages against a hospital for its alleged conduct, which included the improper removal of the physician from its medical staff in bad faith, fabricating false claims against the physician and quality of care issues, and fabricating additional allegations against the physician after his termination in an attempt to give credibility to its actions);
*Brown v. Loudoun Golf & Country Club, Inc.*, 573 F. Supp. 399 (E.D. Va. 1983). (a plaintiff alleged that a golf club, through its professional, excluded and ejected from a foursome a guest of one of the members because the guest happened to be black, the court noting that this exclusion policy ran counter to policies firmly embedded in both federal and local law); *Hamre v. City of Bothell*, 81 Fed. Appx. 260 (9th Cir. 2003) (where a homeowner alleged that he was prosecuted on trumped-up charges in retaliation for the homeowner's rude conduct in ordering a police officer off his premises while the officer was responding to a neighbor's noise complaint).
*Macsenti v. Becker*, 237 F.3d 1223, 55 Fed. R. Evid. Serv. 881 (10th Cir. 2001) (a dentist was grossly impaired at the time he commenced delicate dental implant surgery, to the extent that he lost consciousness as many as 10 to 15 times during the process and nevertheless continued his attempt to complete the surgery, heedless of any danger posed by keeping the patient sedated for an unexpectedly, and unreasonably, long procedure).
*Cameron v. Beard*, 864 P.2d 538, 145 L.R.R.M. (BNA) 2553 (Alaska 1993), (the court held that the record supported a former employee's recovery of damages for intentional infliction of mental distress in connection with his constructive discharge where he had been threatened by his former supervisor and the supervisor and others had made behind-the-scenes efforts to collect evidence of his disruptive activity and had worked to create a paper trail designed to culminate in his termination).
*Teamsters Local 959 v. Wells*, 749 P.2d 349, 128 L.R.R.M. (BNA) 2410, 117 Lab. Cas. (CCH) P 56515 (Alaska 1988), (a union member brought an action against a union local for intentional infliction of emotional distress arising out of the local's threats to the member's life if he could not get his wife, who was a supervisor for the employer, to quit during a strike or to disclose confidential information concerning the employer to the union local. The court found that the union local was liable for intentional infliction of emotional distress where severe emotional distress was a foreseeable result of the local's conduct and where the threat to life was outrageous conduct as a matter of law).
*Hamre v. City of Bothell*, 81 Fed. Appx. 260 (9th Cir. 2003) (involved allegations that police officer fabricated police report and filed false charges against homeowner supported a claim for intentional infliction of emotional distress).
*GTE Southwest, Inc. v. Bruce*, 956 S.W.2d 636 (Tex. App. Texarkana 1997), reh'g overruled, (Nov. 25, 1997) and review granted, (Mar. 26, 1998). (An appellate court in Texas held that a supervisor's intentional intimidation, humiliation and embarrassing acts toward employees was legally sufficient to support a claim for intentional infliction of emotional distress).
*Apostle v. Booth Newspapers, Inc.*, 572 F. Supp. 897, 906 (W.D. Mich. 1983), opinion supplemented, 577 F. Supp. 962 (W.D. Mich. 1984). (A newspaper article identifying plaintiff's business as the center of illegal prostitution activity, where witness-a police chief-to whom that statement was attributed denied making such a statement, constituted outrageous conduct sufficient to support a claim of intentional infliction of emotional distress.
*Peoples Bank & Trust Co. of Mountain Home v. Globe Intern., Inc.*, 786 F. Supp. 791, 794 (W.D. Ark. 1992), judgment aff'd and remanded, 978 F.2d 1065 (8th Cir. 1992). (Affirming jury finding that publication of plaintiff's photograph in connection with false story alleging that plaintiff was 101 years old and had become pregnant was outrageous).
*Hoskins v. Howard University*, 839 F. Supp. 2d 268, 281 Ed. Law Rep. 477 (D.D.C. 2012). (Where discharged employees have asserted circumstances involving ethnic, racial, or religious discrimination or harassment as the grounds termination, such claims have been recognized where termination was allegedly accompanied or preceded by racial slurs and epithets).
*Dias v. Sky Chefs, Inc.*, 919 F.2d 1370 (9th Cir. 1990). (Here the Court of Appeals upheld a jury award for wrongful discharge and intentional infliction of emotional distress in favor of an employee who alleged that she was discharged for protesting sexual harassment. In support of her claim that she suffered severe emotional distress as a result of her employer's sexual harassment and her discharge, the employee alleged that she had never been discharged before, was depressed, had psychological difficulty returning to the work force, suffered eating and sleeping disorders, and had to be treated by a psychologist.)

The two basic rules as to questions of law or of fact have been well stated in the Restatement, which has often been quoted by the courts. These are: It is for the trial court to determine, in the first instance, whether a defendant's conduct may reasonably be regarded as so extreme and outrageous so as to permit recovery, or whether it is necessarily so.[19] When reasonable people may differ, it is for the jury to determine whether the conduct has been sufficiently extreme and outrageous to result in liability.[20]

Here are the facts that apply to the case at bar – *for which the evidence is unequivocal*:

(1)	There was never a publication;

(2)	There was never a website;

(3)	This case began approximately *six-hundred days* ago with exchange of correspondence on Tumblr.com. On the other hand, the notion of using a website was on and off the table within a matter of *three days* – permanently and expressly (stated on multiple occasions); and was replaced by a proposed, even-handed approach – to which the Defendant's response what to label the proposal intimidation and illegal (*see* Plaintiff's Affidavit III, p. 3, ¶1). Note that the Plaintiff was seeking to invoke his right to bring a forth a legitimate case with a legitimate controversy - and to have it *heard by the Courts in California* (in the spirit of fairness and equity);

(4)	The Defendant was fully aware of the above. It is virtually impossible that he wasn't.

(5)	The Defendant subsequently crafted his own set of facts to a fictitious storyline and utilized this fictitious story in a deliberate campaign to destroy the Plaintiff, his reputation, and his prospects of employment.

---

[19] § 16:21 Illustrative situations—Recovery sanctioned, 4A American Law of Torts § 16:21
[20] *Id.*

(6) This was purposeful and deliberate - and the Defendant knew fully well that he was lying and applying his lies in a malicious and vicious attack on the Plaintiff.

(7) The Defendant was well aware of the Plaintiff's domestic situation – that his family was depending on his employment as a physician to take over the support of the household – for both his wife and son.

(8) The Defendant wrote to WPRI (July 19, 2020) - in part "he put together a slanderous website about me"; "he threatens to "overlay" his website ... over the top of my website … the man [Plaintiff] is sick and people need to know about this … he should NOT be a doctor … I hope you can do a story on this." The Defendant provided WPRI with the documents he calls a website and rants about it.

(9) The Defendant wrote to the Providence Journal on two occasions (July 15, 2020) – first recalling Plaintiff's 2011 arrest, claiming that Plaintiff has been threatening him. Again, he provides a copy of the documents that were never published, claims they were published and goes into a rant. He states in part "He broke the deal … I was trying to be helpful and he took advantage of me … [Defendant] acts like a backseat lawyer …

(10) The Defendant wrote to CNN (July 19, 2020) – stating in part "I have another story I want to pitch you…I thought I'd [send it to you first] to see if you're interested… I found out that he was reapplying to get his medical license back. I wrote him back and asked him if that was true and he refused to answer… he's now back on his rampage now, threatening to sue me AND to contact doctors across the United States and help them sue me as well… This man is sick and people need to know about this.

(11) On July 21, 2020, after CNN deferred on the story, the Defendant further states to CNN "he's threatening and trying to intimidate me. He's really delusional. I guess he thought his homophobic threats was being cordial! *I really need someone to cover this...*"

(12) On August 3, 2020, the Defendant contacted the Attorney General of Rhode Island. He proffers more of the same.

(13) To the knowledge of the Plaintiff, there has been at least three complaints filed by the Defendant to the Rhode Island Medical Board of Licensure and Discipline (BMD).

(14) In or around July 2020 - the Defendant reported the Plaintiff to the FBI.

Relative to the Plaintiff, emotional distress is in the form of the terror resulting from the Defendant's actions. It began a number of years ago when the Plaintiff first made contact through the Defendant's Tumblr website. His identity was hidden, and the Defendant participated in dialog. At first, he appeared interested and engaged. He asked a number of personal questions. It soon became apparent that the Defendant was taunting the Plaintiff – he was demeaning. It also became clear that the Defendant had no intention of contemplating such a request. His only interest appeared to be to string along and deny the Plaintiff. It appeared that the Defendant enjoyed the game.

Next came the battery of complaints that the Defendant filed ubiquitously. The complaints were crafted smartly. They were detailed and focused. Even though the Plaintiff had set forth a fair and equitable path towards resolution of a legitimate dispute, the Defendant grabbed ahold of a false narrative – claiming that the Plaintiff had published a website that contained false information. He was aware that his narrative was untrue. Nevertheless, the Defendant peddled

this false narrative, and he drew the conclusion – amongst others – that the Plaintiff was unfit to practice medicine. He made this statement even though he lacked the credentials and mental framework to make such an assessment. His words and the timing make it clear that his was a motive of retaliation. They were specifically intended to inflict maximum emotional harm. Given the facts and circumstances, there is no other plausible explanation.

The Plaintiff became horrified. His family needed him to be front and center and to provide for their financial needs. There were endless medical bills and expenses. There was a wife whose physical condition was worsening. Her ability to work was coming to an end. His son – who had been bullied and harassed due to his father's presence on the Defendant's website, and where the Defendant was made aware of this but failed to act – continued to require those things that children do – food, clothing, etc. The Plaintiff had spent years in reconstructing a damaged reputation. He did so methodically. The financial price tag for doing so was high. The Plaintiff had met regularly with the BMD, he did well in law school, his reputation was on the upswing. This process meant everything. It was hard-fought. It was not easy. There were always many moving parts.

The prospects of being summarily dismissed by the BMD based on the Defendant's campaign was very real and the Plaintiff was well aware of this. The Defendant was clever in his writings. The evidence is clear - the Defendant is very experienced at reporting professionals. The wording of his emails makes it perfectly clear that he was acting in retribution (and not out of a general public concern).  All of this was in response to the Plaintiff exercising his right to seek legal recourse in an appropriate manner. The response has been a deliberate campaign intended to do as much harm as possible. The evidence is clear - the Defendant has a long history of misstating facts and making overtly false statements (*See generally* Plaintiffs Affidavit II). He

is emotionally labile and lacks the temperament to address a problem such as this in a mature and appropriate fashion.

As mentioned, there are considerations that make a case for intentional infliction of emotional distress more likely to succeed (discussed *supra*). These "plus factors" (described *supra*) are all present in this case.

### Relative position of power

Here, the Defendant purposely exalts himself into a position of pseudo-authority. He claims to be a patient advocate (which is a false claim) and have concerns for the public's welfare. Once there, he uses his knowledge of, and experience with the system to do harm. He is taking advantage of a societal loophole. The Defendant is without bounds – he is free to say and do whatever he wants while suffering no consequences for the flaws of his actions. There are no limits or boundaries placed on him. He openly claims that " I can do whatever I want" and "you bet I have an axe to grind" (*See generally* Plaintiffs Affidavit II). He is free to say whatever version of truth that he contrives for a given circumstance. On the other side – the Plaintiff is powerless and vulnerable. He has no recourse whatsoever. Response to the Defendant's complaints is unpredictable. Overall, this dynamic creates a relative power differential between Defendant (who assumes a position of power) and Plaintiff (who is the target of the Defendant and is powerless).

### The Defendant's behavior has been on-going and continuous

The Defendant's campaign has been long-standing and continuous. The Defendant first began filing reports with the BMD a number of years prior. It has not stopped. In fact, it has worsened.

The Defendant is acting in retaliation

All the evidence available (i.e. the timing of emails, remarks in preceding emails) make it clear that the Defendant is acting in retaliation. He has invested in a deliberate and pointed campaign and has been relentless. For example, he states "I really need someone to cover this story" (*supra*). This statement suggests that the issue is a personal matter. He writes complaints in a setting where the notion of a website by the Plaintiff was for three days and had long passed. The setting also includes the Plaintiff proposing a fair and equitable plan for resolution. When he makes threats occurring long after any notion of a website has been removed and after the Plaintiff states that he will pursue a legal solution, there is no doubt that his acts are in retribution. He has reported the Plaintiff to every conceivable entity who has some level of power and who might act.

The Defendant is aware of Plaintiff's particular vulnerabilities

The Defendant is aware of the Plaintiff's unique vulnerabilities. First, he is aware of the Plaintiffs wife's diagnosis of pancreatic cancer. He is aware of the importance of the Plaintiff becoming employable – and if this were to fail, it would spell disaster. He is fully aware that his threats and actions illicit fear in the heart of the Plaintiff. The Defendant was asked repeatedly to refrain from such actions. The Defendant is aware that the Plaintiff's son has been bullied and harassed by the posting. He was made aware on multiple occasions. The Defendant has

repeatedly discussed his awareness of relapse. In fact, he has written about this as justification for not removing the Plaintiff's names from his website. In spite of all of these, the Defendant continues his campaign.

The Defendant has placed himself in a position whereby he states to various third parties that the Plaintiff is sick, delusional, should not be a doctor, etc. To place himself in a position of power, and to makes such statements speaks volumes about the Defendant. These actions are irresponsible and patently wrong.

Whether the Plaintiff is fit to practice medicine is an inquiry left to a group of experts – including psychologists, addiction psychiatrists, forensic psychiatrists, and general physicians. It is a decision based on the amount and quality of sober time, multiple psychiatric tests and the patient's activities. It takes years to inform. Even so, there are no guarantees. Even so, many with this disease go on to lead sober and productive lives. The Defendant has no right to place himself in such a position. It truly speaks to his emotional framework and his character. On the other hand, doing so has been the normal course of business for the Defendant. He does whatever he wants because there is nothing to stop him.

When considered in its entirety, the facts and circumstances demonstrate behavior on the part of the Defendant which is extreme and outrageous. His campaign is vicious, deliberate, well-conceived, with intent and purpose. The message is clear. The Defendant would like nothing more than for the Plaintiff to relapse or alternatively - to be deprived of his license.

The Plaintiff's Emotional Distress

It is difficult to express the extent of emotional distress. However, as a direct result of the Defendant's actions, the Plaintiff has suffered severe emotional sequelae requiring treatment by a

psychiatrist (who will provide Affidavit) and physical manifestations including new-onset hypertension. He also suffers from new-onset insomnia, which requires medication to treat. Notably, and to the dismay of the Defendant, he has not suffered a relapse and continues to guard his sobriety. Causation is established by the fact that symptoms began to appear as the Defendant began his campaign of reporting the Plaintiff to the BML. The anxiety that he has created is severe. The Plaintiff will provide expert testimony of two prominent clinicians in support of his claim.

Does this cause of action have merit?

The evidence is clear. The Defendant wrongfully places himself in a position of power – notwithstanding his lack of training or emotional fortitude. He draws conclusions that he ought not – such as the Plaintiff being unfit to practice medicine - when it takes a group of diverse experts acting in tandem to make such a determination. He knowingly proffers false information. His claims are sometimes true but often false. The evidence shows he is vicious and mean spirited. He will try to convince you that his motives are righteous – when the evidence indicates otherwise – that his actions are wholly retaliatory. He claims to represent patient safety. The evidence shows that he does not. He claims to be a part of a patient safety organization. By any standard, this is also false! Instead he hides behind this veil and operates illegally. The Internet is simply an effective venue for this hate-mongers. A simple read of the Defendant's many posts across multiple platforms demonstrates his hateful nature.

Conclusion

Although some emotional distress is expected as the price for living in the world, the law intervenes when the distress severe. Here, sufficient case law has been presented. It includes cases with a wide variety of fact patterns. Based on this, ample justification has been provided to support this claim.

Not only does the claim have merit, it is the only possible recourse. It is the only way to quell the actions of a person who is so mean-spirited, who has learned the ins and outs of a system and precisely how to push the right buttons to inflict harm. He is well-versed and crafted at lying and/or rearranging fact patterns to suit his needs, independent of the actual truth. This has been demonstrated over and over. When he is challenged, he then takes further steps to inflict even more harm. Legal recourse is the only remaining solution. A hate-monger – like the Defendant - who cloak his activity in First Amendment armor should find no solace.

Finally, the defense presents conclusory statements concerning the other causes of action. At the appropriate time, oral argument will be made to address the flaws in these statements.

Respectfully submitted,

Personally signed:

_____
JOSEPH GRILLO, M.D., *pro se*
73 Primrose Hill Road
Barrington, Rhode Island 02806
(401) 406-0012
Jfgrillo1@gmail.com

Dated: October 30, 2020

## CERTIFICATE OF SERVICE

I hearby certify that on October 30, 2020, I served a copy of this Reply through email (Plaintiff's electronic filing privileges are pending) and by first class mail, postage prepaid, upon Defendant's counsel at the following address:

Attorney Samuel D. Zurier
55 Dorrance Street, Suite 400
Providence, Rhode Island 02903

Personally signed:

_____
JOSEPH GRILLO, M.D., *pro se*